**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **RALPH NEWCOMB and JESSICA** | ) | |
| **NEWCOMB, as next friends for B.N.;** | ) | |
| **TODD MATHIS and LESLEY** | ) | |
| **MATHIS, as next friends for H.M.,** | ) | |
| | ) | |
| *Plaintiffs*, | ) | **Case No. 3:24-CV-0631** |
| | ) | |
| **-vs-** | ) | **JURY DEMAND** |
| | ) | |
| **BILL LEE, in his official capacity as** | ) | |
| **Governor of the State of Tennessee,** | ) | |
| **and the WILLIAMSON COUNTY** | ) | |
| **BOARD OF EDUCATION,** | ) | |
| | ) | |
| *Defendants*. | ) | |

## REDACTED COMPLAINT

COME NOW THE PLAINTIFFS, RALPH NEWCOMB and JESSICA NEWCOMB, as next friends for B.N.; and TODD MATHIS and LESLEY MATHIS, as next friends for H.M., and respectfully file this Redacted Complaint fully redacting all identifying information concerning the minor children B.N. and H.M. based on one oversight in ¶ 24 of the original complaint wherein the identify of one of the minors was inadvertently disclosed. With the exception of this single correction, this Redacted Complaint is, in all respects, identical to the original-filed complaint [Doc. 1].

## I.
### Introduction

1. Plaintiffs, Ralph Newcomb and Jessica Newcomb, in their capacity as next friends for B.N., a minor child; and Plaintiffs Todd Mathis and Lesley Mathis, as next friends for H.M., a minor child; bring this action against Bill Lee, in his official capacity as Governor of the State of Tennessee and the Williamson County Board of Education.

2.  Both of the minor plaintiffs are middle-school students enrolled in the Williamson County school system.  They each were criminally prosecuted, placed in solitary confinement, strip searched, forced to undergo evaluations, and placed on house arrest. Both students were humiliated before their peers, deprived of access to their classes and curriculum, and made to suffer other indignities, including the loss of various rights and privileges, and had their academic standing forever tarnished over the misapplication of a criminal statute, Tenn. Code Ann. § 39-16-517, and for allegedly communicating a Threat Level 1 in violation of Williamson County School Board policy.

3.  None of the speech attributed to the minor plaintiffs rose to the level of a threat of mass violence or amounted to actions "that a reasonable person would conclude could lead to the serious bodily injury, as defined in § 39-11-106, or the death of two (2) or more persons", as set forth in Tenn. Code Ann. § 39-16-517.

4.  Plaintiffs seek declaratory judgment to declare Tenn. Code Ann. § 39-16-517 and the corollary enforcement of Williamson County Board of Education's WCS Board Policy 6.309 unconstitutional, as applied to them.

5. Plaintiffs further seek compensatory damages under the Tennessee Governmental Tort Liability Act, Tenn. Code Ann. § 29-20-205, against the Defendant Williamson County Board of Education.

## II.
## Jurisdiction and Venue

6.  This Court has jurisdiction over the claims presented in this action pursuant to 28 U.S.C. § 1331, because this action presents a federal question involving the enforcement of constitutional rights under the United States Constitution.

7. Venue is proper in the Middle District of Tennessee because all of the actions giving rise to these claims occurred within this federal district.

## III.
## Parties

8. Ralph Newcomb is an adult citizen and resident of Franklin, Williamson County, Tennessee. He and his wife Jessica Newcomb, are the natural parents of B.N., a minor age fourteen years.

9. Jessica Newcomb is an adult citizen and resident of Franklin, Williamson County, Tennessee.

10. Todd Mathis is an adult citizen and resident of Fairview, Williamson County, Tennessee. He and his wife, Lesley Mathis, are the natural parents of H.M., a minor age thirteen years.

11. Lesley Mathis is an adult citizen and resident of Fairview, Williamson County, Tennessee.

12. The Williamson County Board of Education is the public board of education organized and existing under the laws of the State of Tennessee.

13. Because the Plaintiffs challenge the constitutionality of a state statute, as applied, (specifically Tenn. Code Ann. § 39-16-517), notice is given to the Attorney General of the State of Tennessee, pursuant to Rule 5.1 Tenn.R.Civ.P.

## IV.
## Facts
## Recent Changes in the Law

14. Tenn. Code Ann. § 49-6-3401(g) lists the various offenses that when committed by a student require a mandatory calendar year expulsion. These offenses are referred to as zero tolerance offenses.

15. Prior to April 28, 2023, there were three zero tolerance offenses under Tenn. Code Ann. § 49-6-3401(g)(2): (A) A student brings to school or is in unauthorized possession on school property of a firearm, as defined in 18 U.S.C. § 921; (B) A student commits aggravated assault as defined in § 39-13-102 or commits an assault that results in bodily injury as defined in § 39-13-101(a)(1) upon any teacher, principal, administrator, any other employee of an LEA, or a school resource officer; or (C) A student is in unlawful possession of any drug, including any controlled substance, as defined in §§ 39-17-402 — 39-17-415, controlled substance analogue, as defined by § 39-17-454, or legend drug, as defined by § 53-10-101, on school grounds or at a school-sponsored event.

16. Effective July 1, 2023, Chapter 299 of the Public Acts of 2023 (following the horrific shooting at Covenant School in Nashville on March on March 27, 2023), the State of Tennessee added as a zero tolerance offence Tenn. Code Ann. § 39-16-517 for threats of mass violence on school property. As a consequence of this statute becoming law, WCS also added a fourth offense to its list of zero tolerance offenses. A student now commits a zero tolerance offense if the student, "Threatens mass violence on school property or at a school related activity pursuant to § 39-16-517."

17. Tenn. Code Ann. § 39-16-517, provides as follows:

**Tenn. Code Ann. § 39-16-517. Threats of school-related mass violence; offenses and penalties**

(a) As used in this section:

(1) "Mass violence" means any act which a reasonable person would conclude could lead to the serious bodily injury, as defined in § 39-11-106, or the death of two (2) or more persons;

(2) "Means of communication" means direct and indirect verbal, written, or electronic communications, including graffiti, pictures, diagrams, telephone calls, voice over internet protocol calls, video messages, voice mails, electronic mail, social media posts, instant messages, chat group posts, text messages, and any other recognized means of conveying information;

(3) "School" means any public or private elementary school, middle school, high school, college of applied technology, postsecondary vocational or technical school, or two-year or four-year college or university; and

(4) "School property" means any school building or bus, school campus, grounds, recreational area, athletic field, or other property owned, used, or operated by any local education agency, private school board of trustees, or directors for the administration of any school.

(b) A person who recklessly, by any means of communication, threatens to commit an act of mass violence on school property or at a school-related activity commits a Class A misdemeanor.

(c) As a condition of bail or other pretrial release, the court may, in its discretion, order the defendant to undergo an evaluation, under § 33-7-301, to determine whether the defendant poses a substantial likelihood of serious harm to the person or others.

(d)(1) Any person who has knowledge of a threat of mass violence on school property or at a school-related activity shall report the threat immediately to:

(A) The local law enforcement agency with jurisdiction over the school property or school-related activity; and

(B) The school that is subject to the threat of mass violence.

(2) The report must include, to the extent known by the reporter, the nature of the threat of mass violence, the name and address of the person making the threat, the facts requiring the report, and any other pertinent information.

(3) Any person who has knowledge of a threat of mass violence on school property or at a school-related activity and knowingly fails to report the threat commits a Class B misdemeanor.

(d)  In addition to any other penalty authorized by law, a sentencing court may order a person convicted under subsection (b) to pay restitution, including costs and damages resulting from the disruption of the normal activity that would have otherwise occurred

on the school property or at the school-related activity but for the threat to commit an act of mass violence.[1]

18.    As stated, the new statute contains the following definitions that are applicable to this new offense: (a) (1) "Mass violence" means any act which **a reasonable person** would conclude could lead to the serious bodily injury, as defined in § 39-11-106, or the death of two (2) or more persons; (2) "Means of communication" means direct and indirect verbal, written, or electronic communications, including graffiti, pictures, diagrams, telephone calls, voice over internet protocol calls, video messages, voice mails, electronic mail, social media posts, instant messages, chat group posts, text messages, and any other recognized means of conveying information; (3) "School" means any public or private elementary school, middle school, high school, college of applied technology, postsecondary vocational or technical school, or two-year or four-year college or university; and (4) "School property" means any school building or bus, school campus, grounds, recreational area, athletic field, or other property owned, used, or operated by any local education agency, private school board of trustees, or directors for the administration of any school. (emphasis added).

19.    Based on the General Assembly's passage of the new mass violence statute, Tenn. Code Ann. § 39-16-517, WCS amended its zero tolerance policy to add the following provision:

> THREATS OF SCHOOL-RELATED MASS VIOLENCE. Students shall not, by any means of communication, threaten to commit an act of mass violence on school property or at a school-related activity. "Mass violence" means any **act which a**

---

[1]  The statute was amended effective July 1, 2024, to provide as follows:

SECTION 1. Tennessee Code Annotated, Section 39–16–517, is amended by adding the following new subsection: TN ST § 39–16–517

(f) If a juvenile is adjudicated delinquent for a violation of subsection (b) pursuant to title 37, chapter 1, part 1, then the disposition must include, in addition to any other disposition authorized by law, the suspension of the juvenile's driving privileges or ability to obtain a driver license for a period of one (1) year in accordance with the procedure set out in title 55, chapter 10, part 7.

TN LEGIS 727 (2024), 2024 Tennessee Laws Pub. Ch. 727 (S.B. 1664).

**reasonable person would conclude** could lead to the serious bodily injury or the death of two (2) or more persons.

"Means of communication" means direct and indirect verbal, written, or electronic communications, including graffiti, pictures, diagrams, telephone calls, voice over internet protocol calls, video messages, voice mails, electronic mail, social media posts, instant messages, chat group posts, text messages, and any other recognized means of conveying information. "School property" means any school building or bus, school campus, grounds, recreational area, athletic field, or other property owned, used, or operated by any local education agency, private school board of trustees, or directors for the administration of any school.

All local education agencies and public charter schools should work with their local attorneys to ensure policies, procedures, and parent and student handbooks are revised to include this change in the law prior to the beginning of the 2023-24 school year. (emphasis added).

## Facts Pertaining To The Newcomb Family

74.     Ralph Newcomb and Jessica Newcomb are the parents of B.N.

75.     The Newcomb family moved to Williamson County, Tennessee in 2022 from Wisconsin.

76.     B.N. is fourteen years old and attends the eighth grade at Page Middle School.

77.     The Newcombs' home is situated directly behind Page High School.

78.     While in Wisconsin, B.N. attended Parkway Elementary from Kindergarten through his third grade. He then attended Glen Hills Middle School for his fourth grade until the COVID-19 pandemic struck in Spring 2020, and he continued with remote learning. B.N. then attended a private Lutheran school for his fifth and sixth grades prior to his relocation to Tennessee.

79.     In the fall of 2023, B.N. enrolled at Page Middle School for his seventh-grade year.

80.     B.N. has been a good student and, prior to the events in question, maintained a spotless disciplinary record.

81.     B.N. is has been a member of the College Grove Basketball team since 2022, he has attended Youth Ministry at LifePoint Choice, and is also an active member of the Page Middle School football team. He spent the spring and summer of 2023 being personally trained by a former NFL player, who is also a neighbor, in order to make the varsity football team.

82.     In 2015, when B.N. was six years old, he was diagnosed with Severe Dyslexia and Attention Deficit Hyperactivity Disorder (ADHD). Ms. Newcomb was advised at the time by B.N.'s psychologist that it was extremely doubtful that he would ever be able to read.

83.     As a learning impaired student, B.N. received a comprehensive 504 while attending public school in Wisconsin.

84.     When he enrolled at Page Middle School, Ms. Newcomb elected to hold off implementing a 504 or an IEP plan to wait and see how B.N. adjusted to his new school environment. Leslie Woods, the 504/IEP coordinator at Page Middle School agreed with this approach, and said the school would allow for some accommodations without any formal 504 or IEP plan set in place for B.N.

85.      During B.N.'s seventh grade term, B.N.'s teachers and Ms. Woods were all aware of his dyslexia and ADHD.  Ms. Newcomb also worked closely with all of B.N.'s teachers to make sure B.N. was getting the assistance he needed.

86.     On August 8, 2023, Page Middle School administrators met with students to discuss certain school expectations regarding student conduct. During the meeting, the presenters used a PowerPoint presentation with 28 slides to emphasize what was referred to as "more important topics". B.N.'s take away from the assembly was that the emphasis was on changes in dress code or inappropriate touching.  B.N. does not recall any discussion of threats of mass violence or the possible severe repercussions of making such threats.

87.     Slide No. 5. Discussed Zero Tolerance offenses:

*[Graphic on next page]*



88.     B.N. turned 14 years old on August 9, 2023.

89.     The following day, B.N. was excited about his upcoming opportunity to play in the first school football game that evening.

90.     While at lunch on August 10, 2023, B.N., two of his friends, Student #1 and Student #2, were talking with another student who was unknown to them. The student began talking about his summer and shooting guns with his grandfather. He mentioned that his grandfather had a variety of guns, including AK-47's, grenade launchers, and shotguns. B.N. was curious and began asking the student what types of guns he was shooting, where he was shooting the guns, and was dubious of whether the student was telling the truth.

91. This conversation did not involve any reference to B.N. himself possessing, shooting, or bringing any guns or explosive devices anywhere.

92. After lunch, B.N. and his friends dispersed and went to recess followed by Language Arts class.

93. After entering his Language Arts class, B.N. began a conversation with a student about his curious encounter in the lunchroom with the student who had discussed shooting guns with his grandfather. He recounted the conversation and commented that he personally thought the student was weird.

94. At no time did B.N. communicate any threat or refer to any imminent activity involving guns or bombs. He did indicate, in a joking manner, what this other student he had met at lunch might do with guns or bombs.

95. B.N.'s final class period that day was science. Prior to class, and while surrounded by several of his friends, B.N. shared with them the conversation he had earlier that day with the student in the lunchroom. B.N. told them about the stories that this student shared about his grandfather, and his claims of shooting an AK-47. Again, he jokingly commented about what this student might do, all the while sharing his doubts that the student was telling the truth about his access to such guns or weapons.

96. At no time did B.N. ever claim that he personally had access to any gun; nor did he ever threaten to bring a gun or other weapon to the school.

97. On August 10, 2023, at approximately 4:50 p.m., Page Middle School Assistant Principal Chris Hawkins and Principal Dr. Eric Lifsey, contacted police officials regarding an email they received from a Page Middle School parent.

98.     The email was from Leslie Nix, the mother of R.H.N., an eighth-grade student at Page Middle School. The email falsely reported that her son, R.H.N. overheard another Page Middle eighth grade student, B.N. discussing with another student whom he did not know that B.N. "had a gun in his backpack and was going to shoot somebody". The email went on to say, "he was going to get a bomb and blow someone up." R.H.N. falsely reported that B.N. was saying this loudly and in close proximity to others who must have overheard it.

99.     Detective Lee Eaves interviewed R.H.N., who provided him with a description of a student whom R.H.N. thought heard the threat.

100.    Deputy A. Winnett and Assistant Principal Regina Rathbone identified the student as an eighth grader named H.T. Then, Deputy A. Winnett spoke with H.T. and asked if he overheard any threat by another student. H.T. denied ever hearing any such threat.

101.    Deputy A. Winnett spoke to Detective Eaves, and relayed what he learned from his interview with H.T.

102.    On August 10, 2023, B.N. played in his first home middle school football game at Page Middle School. Mr. and Ms. Newcomb attended their son's first game.

103.    At the conclusion of the game, as he was on his way to the locker room, B.N. was confronted by the school Principal and an armed officer on the football field in front of his teammates, other students and parents. B.N. asked what this was about and Dr. Lifsey responded that he could not discuss the matter with B.N. and that they would need to set up a meeting with his parents.

104.    Mr. and Ms. Newcomb were in the stands when B.N. was approached by Dr. Lifsey, and were not present when their son was later approached by the principal and security officer.

105.  B.N. told his father what happened when he got in the car, and said that he did not know why Dr. Lifsey wanted to meet with them.

106.  When the Newcombs arrived back home around 8:20 p.m. that evening, they observed two SUV's parked outside their home. The two individuals identified themselves as Williamson County Sheriff's officers, Deputy A. Winnett and Detective Eaves.

107.  Deputy A. Winnett and Detective Eaves spoke to Mr. Newcomb in the driveway. Both Deputy A. Winnett and Detective Eaves asked Mr. Newcomb if they could come inside and speak to B.N. Mr. Newcomb declined.

108.  When Mr. Newcomb asked why Deputy A. Winnett and Detective Eaves were interested in speaking with B.N., they explained the allegations, saying that B.N. was being accused of making threats concerning guns and bombs at school.

109.  Plaintiffs allege that Deputy A. Winnett and Detective Eaves then telephoned Dr. Lifsey and told him about their visit to the Newcomb's home. Dr. Lifsey stated that he would call Mr. Newcomb and have him escort B.N. to school on Friday morning, August 11, 2023, at 7:00 a.m. for questioning.

110.  Ms. Newcomb received a telephone call from Dr. Lifsey approximately five minutes after Deputy A. Winnett and Detective Eaves left the Newcomb residence. Dr. Lifsey advised Ms. Newcomb that he had received a disturbing email from a parent that their child overheard B.N. saying something about having a gun in his backpack and shooting up the school and having a bomb at his home.  He informed her that she needed to bring B.N. in first thing in the next morning to discuss this incident.

*Complaint - 12*

111.    Ms. Newcomb asked her son about the accusations. B.N. denied ever making any such threats, and told his mother that he never said that he had a gun, or that he would shoot up the school, or that he possessed a bomb.

112.    On August 11, 2023, at approximately 7:30 a.m., Mr. and Ms. Newcomb arrived at Page Middle School with B.N. where they met with Dr. Lifsey and Mr. Hawkins.

113.    He stated again that he received an email from a parent that her child overheard B.N. making threats about having a gun in his backpack and shooting up the school and something about a bomb at home and blowing up the school. He asked if B.N. said that and B.N. replied "No!" He asked if other people threatened guns and bombs and B.N. said "No."

114.    B.N. was asked whether he had heard anything in general about any threats to use guns or bombs.

115.    Dr. Lifsey advised the Newcombs that this allegation would be investigated. He admitted, however, that there was only one individual who had made this accusation and that "kids talk and rumors circulate" and they wanted to be fair and hear B.N.'s side of the story.

116.    Dr. Lifsey assured the Newcombs during this meeting and said: "we are not concerned".

117.    Dr. Lifsey also told Ms. Newcomb that, "you surrender your kids when you drop them at the school."

118.    Nothing was mentioned by Dr. Lifsey about the new Tennessee statute which had just taken effect the prior month in July of 2023 regarding threats of mass violence, or any possible repercussions for B.N.

119.    Dr. Lifsey allowed B.N. to return to class as usual.

120. B.N. saw R.H.N. in class and asked R.H.N. if he knew who was spreading false rumors and accusations that he made threats involving the use of weapons at school. He also asked another student friend, F.O. if he knew anything about who was circulating such false rumors.

121. Following this discussion, R.H.N. went to the school office and reported to Dr. Lifsey that B.N. was talking about guns.

122. Assistant Principal Chris Hawkins contacted Deputy A. Winnett on August 11, 2023, and told him that R.H.N. reported hearing B.N. talking about school threats again. R.H.N. stated that he heard B.N. speaking to students in the hallway, and identified one of them as a student named F.O. This was a false report and misconstrued what R.H.N. had reported about B.N.

123. F.O. was called to the office.

124. F.O.'s father Patrick O'Brien arrived at Page Middle School and sat in the interview with his son and school administrators. Mr. O'Brien advised F.O. to tell them everything he knew about the matter.

125. F.O. stated that on August 10, 2023, "he thought [B.N.] was joking about making a threat to the school." He admitted, however, that he did not remember B.N.'s "exact" words. He mentioned that he heard something about a bomb but did not remember anything about a gun, and that another student, B.B. overheard the conversation.

126. B.B. was called the office. B.B. stated to administrators that he heard B.N. "say something about having an AK in his backpack to [F.O.]." B.B. also said that he "heard [B.N.] use the word bomb and that he had it in his backpack." B.B. then stated that he heard B.N. say, "he would shoot up the school."

127.    Deputy A. Winnett contacted Detective Eaves and Assistant District Attorney Jay Fahey. ADA Fahey advised Deputy A. Winnett to take B.N. into custody for violating T.C.A. 39-16-517, a statute captioned "Threat of Mass Violence on School Property".

128.    On August 11, 2023, Deputy A. Winnett arrested B.N. and transported him to the Williamson County Juvenile Detention Center.

129.    At 2:20 p.m. Ms. Newcomb was notified by her husband, that their son had just been arrested. She asked why B.N. was arrested and Mr. Newcomb told her that it was for allegedly making threats of mass violence.

130.    Ms. Newcomb immediately called Page Middle School and demanded to speak to Dr. Lifsey. Ms. Newcomb asked him what was going on, and Dr. Lifsey advised her that B.N. was no longer on school grounds because he "felt that was the right thing to do." He also informed Ms. Newcomb that B.N. was arrested for making mass threats of violence to the school, and said that there was nothing he can do, and that it was now a criminal matter.

131.    Between 3:00 p.m. and 4:00 p.m. that day, Mr. Newcomb called the Juvenile Detention Center trying to obtain information about his son. When that failed, he visited the Center and was informed that B.N. was being processed, and was not allowed to have contact with his parents. He was also informed that B.N. was being placed on a 24-hour solitary confinement hold until a hearing scheduled for the following Monday.

132.    When B.N. arrived at the Juvenile Dentation Center, B.N. was asked if he was in a gang, and then required to strip down and change into jail attire, while an adult male guard was facing away from B.N.

133.    While in custody, B.N. was interviewed at approximately 7:20 p.m. by Youth Villages Louise Walker. B.N. told Ms. Walker that he never threatened any mass violence or made

any threats to anyone. He described this to Ms. Walker as a misunderstanding and that someone must have twisted his words.

134.    Ms. Walker's findings/recommendations were that B.N. had "poor impulse control and inappropriate humor." She found that B.N. "displayed remorse about the situation," and that "[d]ue to the behavioral nature of [B.N.'s] actions . . . diversion back into his parents' care with a safety plan was recommend to In-home services."

135.    Shortly after Ms. Walker interviewed B.N., she called Ms. Newcomb. Ms. Walker told Ms. Newcomb that B.N. denied making any threats and that this was all just a misunderstanding and that someone mixed up his words and that she believed him. She told Ms. Newcomb that he was not homicidal or suicidal. She recommended that he be immediately released to his parents. Ms. Walker told Ms. Newcomb that she was going to escalate the case to her supervisor and then try to reach the Director who was more familiar with the judicial process to try and get B.N. released.

136.    Ms. Walker called back approximately at 10:00 p.m. and told Ms. Newcomb that she was trying everything she could but that most of the individuals that had the power to do something were all in Knoxville for a conference, and that she had been unsuccessful in trying to reach anyone.

137.    On August 12, 2023, Ms. Newcomb called in the morning to check on B.N. She was told that she could see him after the 24-hour hold expired at 3:00 p.m.

138.    At 3:00 p.m. sharp Ms. Newcomb was at the Juvenile Detention Center. B.N. came out dressed in the gray jail attire – sweatpants, sweatshirt, socks and sandals. His eyes were the reddest she had ever seen them as he had been crying nonstop. Ms. Newcomb was only allowed

to briefly hug her distraught son, and then she could sit across a table from him with no further physical contact.

139.     B.N. cried nonstop through the entire visit with his mother. He explained to her that he had been locked in a cell alone the whole time, reading the charges over and over again. He told her that this was just a misunderstanding and that his words were twisted from a conversation at the lunch table.

140.     Ms. Newcomb asked her son if he had showered, brushed his teeth, or had deodorant. B.N. said that he had none of that. She signaled for a guard to inquire why her 14-year-old son had none of the basic hygiene necessities. The guard said that he had to sign up for those things.

141.     Ms. Newcomb requested that B.N. be allowed to sleep in an individual cell for the next 48 hours.

142.     That night Ms. Newcomb was allowed a 10-minute phone call with B.N.

143.     On August 13, 2023, Ms. Newcomb returned to the Juvenile Facility at 3:00 p.m. for another 30-minute visit. B.N. told his mother during this visit that he was in a cell with 17-year-old car thieves that had been there for months. He told her about how they talked about guns and drugs and how they faked being suicidal monthly so they could be transferred to the hospital since it was a better facility and had better food.

144.     During the visit B.N. repeatedly told his mother that all he wanted was to return to school and play football, and asked her what were his chances of that happening.

145.     He told her that the fluorescent lights were left on all night long and that he slept on a tiny mat on a metal bed; and that ate all his meals in his cell, going outside only briefly.  He

was frighted to use the commode because there were always people watching and cameras were present.

146.    On August 13, 2023, three days after allegations were made against B.N., Dr. Eric Lifsey, sent the Page MS Weekly Newsletter to all parents, including Ms. Newcomb. This newsletter email was the first mention to parents of the new Zero Tolerance laws and policies.

147.    The August 13, 2023, email stated the following:

From: **Eric Lifsey** <noreply@wcs.edu>
Date: Sun, Aug 13, 2023 at 5:01 PM
Subject: PageMS Weekly Newsletter 8-14-23
To: Page Middle School Recipients <recipients@wcs.parentlink.net>

Page Middle Families,

Tomorrow is a Late Start Monday.  Car traffic will be heavy so please leave home early enough to be at school by 8:15.   Busses will run at their regular time.  School will not begin until 8:25. Any student arriving before 8:15 should report to their designated location. 6th grade will report to the cafeteria.  7th and 8th grade will report to the gymnasium.

Wednesday evening is Open House from 6:30 to 8:00.  Doors will open at 6:00 and parents will gather in the cafeteria and lobby until 6:20 when you will then head to your student's homeroom class.  This is a parent centered event, and we ask you to please leave children at home if you can.

On Tuesday last week we met with students and discussed school expectations.  The PowerPoint used for this meeting, which emphasizes the more important topics, is attached to this email.  Please be sure to discuss these expectations with your children.

School safety is at the forefront for all schools in Tennessee this year.  We held our first safety drills this week.  We emphasized to our students the important role they play in school safety, both in the building and out.  I want to remind families that laws were introduced this past year that make it a crime to make a threat in any manner of mass violence against a school.  School threats are a Zero Tolerance offence just like drugs and weapons.  In September Page Middle will host a parent education seminar about online safety. Safety is everyone's responsibility.  Please check out the WCS webpage about school safety.  https://www.wcs.edu/Page/10355.

Parents we need your support to provide the best resources and activities for your child.  Please check out our PTO newsletter and find out how you can help and get involved.

As always, please open and view all attachments.

Week 1 is behind us, 35 more to go….Let's make the most of all of them!

Thank you,

Dr. Eric Lifsey

148.    On August 14, 2023, at 2:00 p.m., four days after his incarceration, B.N. had his first court appearance. The hearing was conducted via Zoom since the magistrate was in Knoxville. The audio kept fading in and out, and the hearing was fraught with technical issues.

149.    Later that afternoon, B.N. was released to his parents, but his personal freedoms were strictly curtailed, and he was effectively a prisoner in his home. The conditions of his release were as follows:

   a.  He would remain under constant house arrest;

   b.  He was to have no communication with the outside world;

   c.  He was completely banned from any Williamson County School grounds;

   d.  He was to remain under parental supervision at all times;

   e.  A staff member from the Juvenile Detention Center would call nightly to ensure he was with a parent;

   f.  He could have a GPS device placed on his person at any time;

   g.  He was subject to random drug tests at any time;

   h.  No firearms were allowed in the Newcomb household;

   i.  He would be under the supervision of an Intensive Probation Officer;

   j.  The Department of Child Welfare would be making a visit and a referral to an intensive therapy program; and

   k.  Deputies would need to make a safety sweep of the Newcomb home.

150.    Mr. Newcomb was with B.N. as he was being released from the Juvenile Detention Center, and Ms. Newcomb left to pick up their younger son from school.

151.    When Ms. Newcomb and her younger son arrived home, they were met by two deputies, who arrived prior to Mr. Newcomb and B.N. arriving home.

152.    Ms. Newcomb instructed her younger son to hide in her bedroom, as she did not want him to witness the safety sweep.

153.    They searched B.N.'s entire room; commenting that it was awfully clean for a 14 year old and asked if she was hiding something. The Officers were attempted to make an issue of

the Newcomb's gun collection, which were locked in a gun safe, and were family heirlooms. After making a phone call, they dropped the subject emphasizing that they must remained locked.

154.    On August 14, 2023, Ms. Newcomb called the school first thing in the morning as her younger son who is in the 6th grade at Page Middle School was terrified to go to school after what happened to his older brother. She was given an appointment to meet with Dr. Lifsey at 11:00 a.m. to discuss B.N.'s punishment.

155.    Ms. Newcomb's husband has stage 4 cancer and the trauma that the Newcomb family had endured up to this point was aggravating his condition. So, Ms. Newcomb asked a trusted family friend, Kal Helou, to attend the 11:00 a.m. meeting. Mr. Helou, who has known the Newcomb's for over 35 years, is a semi-retired trust attorney and is over 80 years old. Ms. Newcomb simply asked Mr. Helou to attend the meeting as she was emotionally drained and needed support.

156.    When Ms. Newcomb and Mr. Helou arrived at Page Middle School Dr. Lifsey inquired as to who Mr. Helou was and why he was there. Mr. Helou introduced himself and explained repeatedly that he was not there as the Newcomb family attorney, nor was he there in any sort of legal representative manner, but simply there as a supportive family friend. Dr. Lifsey refused to allow Mr. Helou to sit in and support Ms. Newcomb in the meeting, and stated that he would not be allowed in the meeting unless the school attorney was present.

157.    Left with no choice, Ms. Newcomb went into the meeting to alone.

158.    Ms. Newcomb had understood that when B.N. was suspended that it was only going to be for five days maximum. Dr. Lifsey explained that instead it was a 365-day suspension under the zero tolerance rules, and that there was nothing they could do for B.N. by virtue of the new Tennessee statute governing threats of mass violence.

159.    Dr. Lifsey explained that B.N. would need to go to ALC and that he was kicked off the football team, and that he would not be allowed on any Williamson County School grounds or he could be arrested for trespass.

160.    Dr. Lifsey asked Ms. Newcomb to bring B.N. to the school once he was released from jail so that he could serve the suspension paperwork for him to sign at which time B.N. could tell his side of the story.

161.    Ms. Newcomb told Dr. Lifsey she would not subject her son to such a meeting and that he had been humiliated enough by Dr. Lifsey. Dr. Lifsey was taken aback, telling Ms. Newcomb that he didn't know what to say and that he would have to reach out to the school administrators above him as no one had ever refused this process.

162.    Ms. Newcomb explained that B.N. is a minor and she offered to sign the suspension documents on his behalf as his parent.

163.    On August 15, 2023, Ms. Newcomb received an email from Dr. Lifsey offering to meet with B.N. through a Zoom meeting. Ms. Newcomb replied and said B.N. would not be participating in such a meeting.

164.    On August 16, 2023, Ms. Newcomb and her husband received the following email from Dr. Lifsey:

> As the request for a meeting to discuss [B.N.]'s behavior and subsequent discipline have gone unanswered, I am sending you a Notice of Suspension for [B.N.]. Included with the Notice of Suspension is a form you may use to request a Disciplinary Appeal of the suspension.
>
> [B.N.] will have the opportunity to attend the Alternative Learning Center. Information about the ALC is included in the attachment to this email. A Family Orientation Meeting to the ALC is conducted via Zoom and is held on Thursday at 9:00. Someone from the ALC will contact you with information about this meeting.

I encourage you to read all these documents carefully to fully understand the options available for [B.N.].

165.     Less than 48 hours after B.N. was released from the Juvenile Detention Center Ms. Newcomb began receiving several telephone calls regarding registration for B.N. to ALC. She was warned that if he did not attend ALC, or if he was not removed from the district and homeschooled, she would face criminal sanctions for truancy and possible incarceration herself for up to 8-10 days.

166.     Given his emotional condition, recovering from the shock and trauma of his incarceration, B.N. was in no condition to start ALC. The entire Newcomb family was still in a state of crisis over B.N.'s arrest and incarceration.

167.     Ms. Newcomb contacted B.N.'s pediatrician who provided a medical note to ALC requesting a two-week recovery period to help him stabilize from the trauma.

168.     On August 22, 2023, the Newcombs had B.N. undergo a complete forensic evaluation and cognitive testing for two whole days by Dr. Julie A. Gallagher, a Board Certified Forensic Psychologist. Dr. Gallagher addressed some concerns that were raised due to B.N.'s failure to connect the accusations against him to a conversation that he had in the cafeteria the day before he was accused of making threats.

169.     Dr. Gallagher explained in a letter to B.N.'s attorney Joseph Fuson on September 6, 2023, that:

It was only when he was able to read the accusations in detention that he connected the two things. This delay in processing until he was able to sit still and focus on the written allegations is consistent with his neurocognitive profile. [B.N.] is a non-neurotypical child with learning differences and ADHD and this should be kept in mind when assessing the evidence in this case.

170.    Approximately, two or three weeks after B.N.'s arrest, the school administration at Page Middle School sent the following email to parents regarding a rumor of a threat:

Page Middle Families,
We were made aware after school today that there has been a rumor spread by a group text stating a student was going to bring a gun to school tomorrow.  We have been working with the Williamson County Sheriff's Office and they have determined this is not a credible rumor or threat.  As always if your child hears something, please have them report it to the school or SRO instead of texting to others.  If your child shares with you information that concerns you, please contact myself or a staff member at our school.   Safety will always be a priority in Williamson County Schools and Page Middle
In addition, I encourage you to talk with your child about being a responsible young adult. To help begin the conversation, here is a video regarding threats (https://youtu.be/04HU3m1J9mU) created by Williamson County Schools and the Williamson County Sheriff's Office.
Thank you for your continued
 support of Page Middle School.

171.   On August 28, 2023, B.N. appealed his suspension.

172.  The first disciplinary hearing with the Disciplinary Authority was conducted on August 29, 2023.

173.  Dr. Lifsey spoke first. He mentioned during his presentation that he had received a text message from a community member giving him a heads up that a parent would be sending him an email regarding a threat.

174.  While the moderator of the appeals panel praised B.N. for his speaking skills, maturity and poise,  the punishment was affirmed.

175.    On September 7, 2023, Ms. Newcomb, B.N., the Newcombs' attorney and Superintendent Jason Golden met regarding B.N.'s appeal of his one-year suspension.

176.    During the meeting B.N. recited again the truth regarding what had happened. B.N. explained that he made a statement about the boy he thought was weird, and shot guns with his father and grandfather. He explained that he had stated that he thought this boy was the type of kid who would have guns in his backpack.  Superintendent Golden adamantly said three times that he had all the power and was the only one with the authority to possibly reduce the zero tolerance, one year suspension. Superintendent Golden stated that he wanted to review the audio tape from

*Complaint - 23*

the disciplinary hearing, but that he was attending a meeting in Gatlinburg the following week, therefore, he did not give a timeline in which he would give his decision.

177.     On September 15, 2023, Superintendent Golden emailed Ms. Newcomb with his decision:

From: **Jason Golden** <jasong@wcs.edu>
Date: Fri, Sep 15, 2023 at 10:24 AM
Subject: Your discipline appeal
To: jessicanew1214@gmail.com <jessicanew1214@gmail.com>
CC: Eric Lifsey <ericl@wcs.edu>, Josiah Holland <josiah.holland@wcs.edu>


Ms. Newcomb,


Thank you for our discussion last Thursday regarding your appeal of your son's one year suspension. After reviewing all the information available to me, including our conversation with your son, I have concluded that your son created a rumor of a threat of a weapon at school. I respect that [redacted] intended it as a joke, but that joke caused a disruption in school. Based on this, I've determined that he has served an appropriate amount of time at the ALC and should return to school Monday.  I've cc'd both Dr. Lifsey and Mr. Holland to ask them to schedule a meeting early Monday morning at Page Middle School to make sure [redacted] has a good transition back to his school.


Jason Golden

Superintendent

Williamson County Schools

(615) 472-4003

178.     During B.N.'s time under house arrest, Ms. Newcomb received nightly phone calls from the Juvenile Detention Center inquiring whether B.N. was home. The caller reminded her that B.N. could not go anywhere without a parent. However, Ms. Newcomb did receive approval for B.N. to attend his church youth group on Wednesday evenings from 6:30-8:00 p.m.

179.     B.N. was issued an Intensive Probation Officer, Officer Raymond Waymond; who came to the Newcomb home twice a week.  The first time B.N. met with Officer Waymond, he underwent a lengthy interrogation and was asked such intrusive questions as:   Does your father beat your mother? Do you harm yourself?  Have you ever been penetrated anally/orally? Do your parents or family members do drugs?

180.     When the caseworker from the Department of Child Services made their mandatory visit, B.N. was again subjected to a similar interrogation.  DCS inspected every room in the Newcombs' home,  and invaded the Newcomb family's privacy.

181.     At B.N.'s first court appearance following his release from custody, following a three-hour wait in court, the Assistant District Attorney finally advised them that the court had no time to review B.N.'s case and it would be continued three weeks. The only alternative offered to enhanced criminal punishment was a diversion program; they never saw the Assistant District Attorney or a judge. The Diversion agreement required continued therapy, that B.N. stay out trouble, and connect on a monthly basis with a Juvenile Services Officer.

182.     When B.N. was placed in a therapy program called the Thrive Program, a counselor visited the Newcomb home and brought with her a plastic tackle box.  She informed Ms. Newcomb that she would need to lock up all of the knives and medications as a precaution because the suicide rates for teens was increasing and B.N. was at risk. The counselor again interrogated B.N. asking the same graphic, inappropriate line of questions. She spoke to Ms. Newcomb as if B.N. was a complete threat to her family, and the community. The counselor advised Ms. Newcomb that most families stayed in the Thrive program for 6-9 months, that meetings were weekly, and that B.N.'s room must be searched monthly.

183.     Ms. Newcomb asked the Thrive counselor what would happen if she did not want B.N. to participate in such a program and refused to sign the paperwork. The Thrive counselor told Ms. Newcomb that would be her choice, but that they would need to report that to the court and that it was to her advantage to participate.

184.     Due to Ms. Newcomb's concerns with the counselor from the Thrive Program, she contacted B.N.'s pediatrician once again. She explained how she felt the Thrive Program was

emotionally and psychologically damaging to her son and her family. He wrote a letter on B.N.'s behalf to the judge, stating that he was making a referral to another outpatient therapy program called Arcadian.

185.     Ms. Newcomb called the counselor from Thrive, and told her that B.N. was no longer going to participate and that the pediatrician was recommending Arcadian.

186.     The Court agreed with B.N.'s pediatrician and allowed him to remain under the care of Arcadian.

187.     On September 18, 2023, B.N. and Ms. Newcomb met with Principal Lifsey and Assistant Principal Higgins, as well as with the ALC director to discuss B.N.'s reintroduction to the school. Dr. Lifsey confirmed that the school administration never considered B.N. to be a threat. He said: "We don't think of you as a threat, that was never the case." He went on to explain that this whole ordeal would never have happened the prior school year. "You can blame Governor Bill Lee."

188.     On October 6, 2023, the court order requiring regular monitoring by an intensive probation officer was finally lifted. However, the detrimental effects to B.N. have been devastating. B.N.'s grades have plummeted, he is no longer engaged, and is miserable at school; despite multiple conferences with all of his teachers and guidance counselors. In order to make up lost assignments, B.N. would begin his school day at 6:45 a.m., twice a week, simply to achieve a passing grade. Fellow students talked behind his back, saying they were afraid of him, and falsely maligned him a "drug dealer". B.N. also suffered from massive headaches upon re-entry to Page Middle School from over stimulation. His learning disabilities compounded the effects B.N. felt upon his re-entry. B.N. had missed the first quarter of the curriculum while at ALC.

189.    As a consequence of the Williamson County Board of Education's ("WCBOE'")
treatment of B.N., as described herein, he suffered a severe and serious emotional injury and was
unable to adequately cope with the mental stress engendered by the circumstances of his case.

### Facts Pertaining to the Mathis Family

190.    Lesley Mathis is the mother of H.M., a minor age thirteen years.

190.    H.M. attends the eighth grade at Fairview Middle School in Williamson County,
Tennessee.

191.    H.M. is a model student and, prior to the events giving rise to this action, had no
disciplinary record.

192.    On Tuesday, August 22, 2023, at 11:39 a.m. Ms. Mathis received a telephone call
from the Williamson County Juvenile Detention Center informing her that H.M. was in their
custody. Neither Ms. Mathis, nor her husband, were allowed to speak to H.M. or see her until 1:00
p.m. the following day, August 23, 2023.

193.     Ms. Mathis immediately called Fairview Middle School but could only leave a
message. Shortly after she left a message at the school, the Fairview Middle School SRO called
her back, and nonchalantly told Ms. Mathis that H.M. had been handcuffed and transported to the
Juvenile Detention Center earlier for making a "Threat of Mass Violence."

194.    Ms. Mathis and her husband immediately went to the school to gain more
information. There they were told that H.M. along with five other friends were communicating
using their school email, chat function.  They handed Ms. Mathis a slip of paper that contained
only one line allegedly written by H.M. which read: "On Thursday, we will kill all the Mexicos."
[sic].

195.   Ms. Mathis later obtained the entire transcript of the school chat conversation, and learned the context of the conversation.  The other girls on the chat were teasing H.M. about looking Mexican because of her darker complexion. One of H.M.'s friends asked in the chat, "what are you doing this Thursday?" H.M. responded in jest, "on Thursday we kill all the Mexico's." To which another friend wrote, "If Mexicans killed ur gonna die."

196.   During the initial meeting with the administration of Fairview Middle School, Ms. Mathis and her husband were told that 'the schools hands were completely tied and there was nothing they could do, and that they had to immediately arrest H.M. and send her to jail.'

197.   Ms. Mathis and her husband were also told to bring H.M. to school the day after H.M. was let out of the Juvenile Detention Center to file the appeal of her 180-day expulsion.

198.   On August 23, 2023, Ms. Mathis was finally able to visit her daughter at the court hearing. During this court appearance, the Mathis family was confronted by several court probation personnel who insisted on coming to the Mathis home to meet with both Ms. Mathis and her husband.  H.M. was also assigned a probation officer.

199.   After court, Ms. Mathis rode in the backseat with H.M. and tried to console her daughter.   H.M. informed her parents that during her incarceration  she was forced to sign documents that she did not understand, without the advice of a lawyer or her parents.

200.   H.M. was forced to remove all of her clothing and undergo a strip search.

201.   She suffered the humiliation of taking a shower while a camera was present and recording.

202.    On multiple occasions, various individuals entered H.M.'s cell and asked her if she had ever had abortions, sex, thoughts of killing herself, touching others, others touching her, all

very inappropriate questions for a thirteen-year-old child without parent present or without a parents knowledge.

203. At one point she became ill and vomited in the cell, when she knocked for help, no one came to assist her.

204. H.M. also reported to her mother on the car ride home that she was suffering from panic attacks, and was terrified from being isolated from her parents.

205. After the Mathis family left the Court, they went to Fairview Middle School as instructed. Ironically, the administrators had no issue with H.M. entering the school and even offered to hug her.

206. The Mathis' met with three of the principals of Fairview Middle School, all of whom offered to attend the appeal meeting, and voiced their support for getting H.M. back in school.

207. On August 23, 2023, a court hearing was conducted on H.M.'s case. The Juvenile Court magistrate made the following findings in a written Order:

> (1) there is reason to believe that the child has a mental illness and/or mental retardation.
>
> (2) it would be in the best interests of the child to undergo an evaluation to determine her mental status to assist the court in disposition of this case;
>
> (3) H.M. should undergo a thorough and complete assessment, it is necessary to involve both a mental health care provider and the Department of Children's Services.

208. H.M. was ordered to submit to an outpatient mental evaluation at The Guidance Mental Health Center and was ordered to undergo an evaluation by a Youth Services Officer (YSO). The Mathis family was also required to submit to a thorough assessment by the Department of Children's Services.

209.    An evaluation was ordered to address whether H.M. was mentally ill or had mental retardation, and she was offered the choice of a voluntary admission or involuntary commitment to determine whether she was competent to stand trial.

210.    She was subjected to an evaluation of her mental condition at the time of the offense, to determine whether she had homicidal or suicidal tendencies, and to determine her IQ.

211.    The August 23 Court Order also ordered a non-custodial assessment by the Department of Children's Services.

212.    In addition, the court ordered that H.M. would be subjected to a search by school personnel or the School Resource Officer before entering any school property.

213.    During the afternoon of August 23, 2023, H.M.'s probation officer came to the Mathis home to conduct a "safety sweep". The Mathis family was forced to remove all guns from their home, and lock up all knives and medications.

214.    The court Ordered that  H.M. be placed on house arrest for a period of eight weeks. She was not allowed to interact with anyone other than her mother and father – not even her grandparents.

215.    H.M. was also assigned an intensive probation officer for "safety monitoring". She was subjected to regular visits. There was also the possibility of random drug screens and GPS monitoring which were interventions that could be initiated and terminated at the total discretion of her probation officer.

216.     On August 24, 2023, the Mathis family attended a meeting with Assistant Principal Lucas Winstead, where H.M. and her family signed the Notice of Suspension paperwork. The Notice of Suspension noted that H.M. was accused of a Threat Level 1 on August 22, 2023.

217.    H.M. submitted a contrite written statement in which she stated her sincere remorse and regret for her words that had been taken wholly out of context, and that she only was joking around with her friends.

218.    On August 29, 2023, just seven days after his daughter was arrested, Mr. Mathis received a letter from Fairview Middle School informing him that H.M. had acquired at least five unexcused absences.

219.    Two days later, on August 31, 2023, Mr. Mathis received another letter from Fairview Middle School stating that H.M. had now accumulated eight absences, and the school system intended to initiate truancy proceedings.

220.    The Mathis family appealed their daughter's suspension to the Williamson County Board of Education.  A hearing was conducted on August 31, 2023, and the board voted to sustain the suspension. Two Assistant Principals from Fairview Middle School attended the hearing, however neither of them said anything to support of H.M. as promised. One of the Assistant Principals did read from a prepared statement that only stated the details of the incident.

221.    The Mathis' appealed to Jason Golden, the Superintendent of Williamson County Schools, who directed that H.M. complete 20 days at the Alternative Learning Center.

222.    H.M. completed the 20 days at ALC, as ordered.

223.    The Mathis family also had to complete the Youth Villages Thrive Program, which consisted of a 'therapist' coming to the Mathis home every Friday to meet with the family and to do safety sweeps of the Mathis family home.

224.    In order to address what the school board determined to be a racist overtone to her comment, H.M. was ordered by the court to draft an essay about five Mexicans who have contributed to our country.

225. As a consequence of the Williamson County Board of Education's ("WCBOE'") treatment of B.N., as described herein, he suffered a severe and serious emotional injury and was unable to adequately cope with the mental stress engendered by the circumstances of his case.

226. In addition to her severe emotional trauma from this incident, as a consequence of H.M.'s arrest, incarceration and suspension, she forfeited her last year to cheer for Fairview Middle School, Eighth Grade recognition night, and numerous other educational activities with her peers.

**Williamson County School Policy**

227. On July 13, 2023, Williamson County Schools updated its "WCS Threat Assessment Flowchart".

228. WCS' stated the purpose of this screening: "to identify circumstances that may increase the risk for potential violence and to assist school staff in developing a safety and supervision plan."

229. Step One of the Flowchart explains:



**Mitigate threat:**
- Take immediate action to protect students, employees and visitors (ALICE if necessary).
- Supervise and isolate student as needed.
- Notify SRO and the supervising Assistant Superintendent as appropriate.
- Obtain a specific account of the threat by interviewing the student who made the threat, the recipient of the threat and other witnesses.
- Attempt to have 2 adults in this interview process. Document the exact content of the threat and statements made by each party. Obtain written statements from all parties involved.

230.     Step two calls for administrators to:



- Involve the team as appropriate
- The preponderance of evidence helps determine the level of threat (levels 1-3)

231.     Step three of the flow chart states: Determine whether it is a singular threat or a threat of mass violence. If a singular threat, proceed with threat protocol and corresponding discipline. If determined to a threat of mass violence, continue with threat protocol for classification, but discipline is always Zero Tolerance.

232.     B.N., and H.M. were all cited and suspended for a Threat Level 1 violation of this new school board policy, which according to the WCS Threat Assessment flow chart is described as:



233.    The response protocol for Threat Level 1, under Step 3(a) is:

[Illustration on next page]



234.    Steps 4 and 5 of the WCS updated Threat Assessment Policy are for Level 3 threats only and were thus not implicated in the Plaintiffs' cases.

235.     On August 21, 2023, Williamson County School Board issued its updated Zero Tolerance Policy.

236.     The new version of the Williamson County School Board Policy 6.039, "Zero Tolerance: Drugs, Drug Paraphernalia, Alcohol, Weapons, and Assault" that is posted to the Williamson County School Board Policy website has a version date of August 28, 2023.

237.     This Zero Tolerance: Drugs, Drug Paraphernalia, Alcohol, Weapons, and Assault Police No. 6.039 provides, in part, as follows:

**ZERO TOLERANCE OFFENSES**

State law and/or the Williamson County Board of Education has classified certain offenses as requiring a mandatory one calendar year suspension upon a determination by the principal that a student has committed one of these offenses commonly referred to as zero tolerance offenses. The following are offenses that automatically result in suspension of one calendar year, except as otherwise prohibited by federal law for students with disabilities. On a case-by-case basis the Superintendent of School may modify the one-year suspension for:

***

5. ASSAULT. Students shall not physically assault or verbally threaten to assault any school employee or school resource officer while on a School bus on school property, or on other grounds used for school purposes, or while attending any school activity or event.

6. **THREATS OF SCHOOL-RELATED MASS VIOLENCE**. Students shall not, by any means of communication, threaten to commit an act of mass violence on school property or at a school-related activity. "Mass violence" means any act **which a reasonable person would conclude could lead to the serious bodily injury or the death of two (2) or more persons.** "Means of communication" means direct and indirect verbal, written, or electronic communications, including graffiti, pictures, diagrams, telephone calls, voice over internet protocol calls, video messages, voice mails, electronic mail, social media posts, instant messages, chat group posts, text messages, and any other recognized means of conveying information. "School property" means any school building or bus, school campus, grounds, recreational area, athletic field, or other property owned, used, or operated by any local educational agency, private school board of trustees, or directors for the administration of any school.

(emphasis added).

238.     At the time of H.M.'s alleged offense, this policy had just been adopted the day before, but was not posted until six days later, on August 28, 2023.

239.     WCS failed to follow its Threat Assessment Flowchart as described above for both of the minor Plaintiffs, subjecting them both to serious and severe emotional injuries, unnecessary criminal prosecution, denial of access to education, and denial of substantive due process.

## V.
## Causes of Action

### COUNT I
### 42 U.S.C. § 1983
### Violation of Fourteenth Amendment Due Process As-Applied

240.     Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs and do further allege as follows.

241.      Students enjoy a property interest in their public high school and middle school education under Tennessee law. See *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

242.      A student's interest is "to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences." *Id*. at 579, 95 S.Ct. 729.

243.      Both minor plaintiffs were accused of a Threat Level 1 mass violence violation.

244.     The minor plaintiffs B.N. and H.M. were criminally prosecuted pursuant to Tenn. Code Ann. § 39-16-517.

245.     Neither of the minor students' actions rose to the level of a credible threat of mass violence, as that offense is set forth in Tenn. Code Ann. § 39-16-517.

246.    Specifically, neither of the minor plaintiffs' actions were acts "which a reasonable person would conclude could lead to the serious bodily injury, as defined in § 39-11-106, or the death of two (2) or more persons."

247.    The application of Tennessee's Mass Violence statute, Tenn. Code Ann. § 39-16-517, to the minor plaintiffs' conduct in this case was arbitrary and capricious sand constitutes a denial of their right to due process under the Fourteenth Amendment.

248.    As a consequence of the application of Tennessee's Mass Violence statute to the minor plaintiffs B.N. and H.M., they each suffered injuries including by illustration and not by limitation the following: They each were criminally prosecuted, suspended, humiliated before their peers, deprived of access to their classes and curriculum. B.N. and H.M. were placed in solitary confinement, strip searched, forced to undergo evaluations, and placed on house arrest. All three students suffered other indignities, including the loss of various rights and privileges, and have their academic standings forever tarnished.

## COUNT II

**42 U.S.C. § 1983**
**Denial of Substantive Due Process**
**Williamson County Board of Education**

249.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs and do further allege as follows.

250.    Schools deprive a student of a property interest in education when it is shown that the education received at the alternative school is significantly different from or inferior to that received at his regular public school," *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1359 (6th Cir. 1996).

251.     The Williamson County Alternative Learning Center ("ALC") is operated by the Williamson County Board of Education.

252.     The ALC is designed to be punitive in nature and is located at the Williamson County Juvenile justice center, a correctional facility which houses pre-trial detainees and those convicted of crimes, including violent offenders.

253.     Students consigned to the ALC are required, as a part of their daily routine, to line up outside of the ALC entrance before 8:00 a.m. where they are exposed to the elements. Once allowed to enter the facility, they are made to remove their belts and walk through a metal detector. Then then are searched, ordered to pull all of their pockets inside out, stick out their tongues. They are subjected to random searches at which times they are instructed to take off their shoes and roll their socks down to their toes.

254.     The classes offered at ALC are not the normal type of classes the minor plaintiffs attended at WCS schools. While course materials and class assignments lag far behind those offered at the plaintiffs' traditional WCS schools.

255.     Both of the minor plaintiffs were forced to try and concentrate on their Chromebook and self-learn their usual assignments while the teacher and other students in the classroom discussed completely different material. If the plaintiffs were unsuccessful, then the each suffered scholastically due to their inability to take examinations in a timely manner.

256.     The educational setting at ALC is chaotic and disruptive. Classroom instruction is repeatedly disrupted when teachers and staff have to remove individuals from the room due to misconduct and disrespect toward the instructor.

257.     The minor plaintiffs do not receive the hand-outs and other learning aids that their student peers in their assigned WCS school classes receive. They are therefore handicapped in

their ability to compete with other students or to maintain acceptable grades and scoring on examinations.

258.    Overall, the educational setting and instruction at ALC is significantly inferior to that which each of the minor plaintiffs were receiving at their WCS schools.

259.    As a consequence of being wrongfully accused of threats of mass violence and denied access to their course of instruction at WCS schools, the minor plaintiffs were deprived of their property interest in education.

260.    The minor plaintiffs also suffered emotional injury and mental anguish, humiliation and were subjected to searches and/or other indignities for which they are entitled to an award of compensatory damages.

**COUNT III**

**Governmental Tort Liability Act**
**Tenn. Code Ann. § 29-20-205**

**Negligent Infliction of Emotional Distress**

**Williamson County Board of Education**

261.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs and do further allege as follows.

262.    The Williamson County Board of Education, acting through its school administrators, owed a duty to B.N. and H.M. to enforce its disciplinary rules consistently and fairly and thus in conformity with state statutes governing student discipline.

263.    Tennessee's Governmental Tort Liability Act does not immunize the WCBOE from liability for negligent infliction of emotional distress.

264.    Tennessee's statute codified at Tenn. Code Ann. § 39-16-517 does not deprive WCBOE school officials from exercising reasonable discretion in determining whether a student's

alleged conduct poses a realistic threat of "mass violence" as an act which a reasonable person would conclude could lead to the serious bodily injury, as defined in Tenn. Code Ann. § 39-11-106, or the death of two (2) or more persons.

265.    The WCBOE, acting through its administrators breached its duty of care owed to B.N. and H. M. by arbitrarily applying its zero tolerance policy in a manner that failed to take into account, in the cases of B.N. and H.M., whether their alleged speech constituted a realistic threat of "mass violence" as an act which a reasonable person would conclude could lead to the serious bodily injury, as defined in Tenn. Code Ann. § 39-11-106, or the death of two (2) or more persons.

266.    The Defendant, WCBOE, was negligent in its application of the zero-tolerance standard under Tenn. Code Ann. § 39-16-517, and adopted instead a policy or practice of routinely referring students to criminal prosecution when their speech in no way constituted a realistic threat of "mass violence" as an act which a reasonable person would conclude could lead to the serious bodily injury, as defined in Tenn. Code Ann. § 39-11-106, or the death of two (2) or more persons.

267.   Specifically, Superintendent Jason Golden's espoused position that he had "all the power and was the only one with the authority to possibly reduce the zero tolerance, one year suspension" was an arbitrary abuse of governmental authority and demonstrated the Defendant's lack of individualized care owed to B.N. and H.M. in the determination of whether their speech constituted a realistic threat of "mass violence" as an act which a reasonable person would conclude could lead to the serious bodily injury, as defined in Tenn. Code Ann. § 39-11-106, or the death of two (2) or more persons.

268.   The Defendant WCBOE's duty to enforce its disciplinary rules consistently and fairly and thus in conformity with state statutes governing student discipline was particularly heightened given the dire consequences B.N. and H.M faced when referred for criminal prosecution under

Tenn. Code Ann. § 39-11-106, and the attendant consequences on these plaintiffs both emotionally and educationally.

269.   As a direct and proximate result of the Defendant WCBOE's breach of its duty of care owed to B.N. and H.M., both plaintiffs suffered serious and severe emotional injuries, including but not limited to, mental anguish, humiliation, embarrassment, loss of enjoyment of life and  other indignities for which they are entitled to an award of compensatory damages.

WHEREFORE, PREMISES CONSIDERED, PLAINTIFFS SEEK THE FOLLOWING RELIEF:

1. That process issue to the Defendant Bill Lee, in his capacity as Governor of the State of Tennessee and to the Williamson County Board of Education and Williamson County, requiring both to answer this Complaint within the time required under the Federal Rules of Civil Procedure;

2. That at the trial of this case the court enter an order pursuant to 28 U.S.C. § 2201 declaring Tenn. Code Ann. § 39-16-517, as applied to the minor Plaintiffs, B.N. and H.M. is unconstitutional as a violation of these plaintiffs' substantive due process rights under the Fourteenth Amendment of the United States Constitution;

3. That at the trial of this case the court enter an order declaring the Defendant Williamson County Board of Education's application of its Policy No. 6.309, as applied to the minor Plaintiffs, unconstitutional as a violation of these Plaintiffs' substantive due process rights under the Fourteenth Amendment of the United States Constitution;

4. That at the trial of this case the court enter an order declaring the Defendant Williamson County Board of Education's punitive assignment and transfer of the

minor plaintiffs to the Alternative Learning Center an unconstitutional denial of these Plaintiffs' property rights in education;

5. That the Plaintiffs each be awarded nominal damages;

6. That Plaintiffs B.N. and H.M. each be awarded compensatory damages against Williamson County School Board in the amount of Three Hundred Thousand Dollars ($300,000.00);

7. That the Plaintiffs be awarded reasonable attorney's fees;

8. That the Plaintiffs have and recover such further and general relief as to which they may be entitled, including the costs of this cause.

9. That a jury of six be empaneled to hear and try all issues of fact presented.

Respectfully submitted,

CRAIN LAW GROUP, PLLC

By: */s/ Larry L. Crain*
Larry L. Crain (#9040)
5214 Maryland Way, Suite 402
Brentwood, TN. 37027
Tel. 615-376-2600
Fax. 615-345-6009
Email: Larry@crainlaw.legal

Emily Castro, Tenn.Sup.Crt. # 028203
5214 Maryland Way, Suite 402
Brentwood, TN 37027
(615) 376-2600
Emily@Crainlaw.legal

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 13th day of June, 2024, a true and exact copy of the foregoing Redacted Complaint was served upon the person(s) listed below via the Court's ECF-Filing System:

Lisa Carlson, Esq.
Buerger, Moseley & Carson, PLC
Two Town Center
4068 Rural Plains Drive, Suite 100
Franklin, Tennessee 37064
*Counsel for Williamson County Board of Education*

Bill Lee, Governor of State of Tennessee
c/o Jonathan Skrmetti
Tennessee Attorney General & Reporter
500 Dr. Martin Luther King Blvd.
Nashville, Tennessee 37246

/s/ *Larry L. Crain*