**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **RALPH NEWCOMB, as next friend for B.N.; JESSICA NEWCOMB, as next friend for B.N.; TODD MATHIS, as next friend for H.M; LESLEY MATHIS, as next friend for H.M,** | ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | **Case No. 3:24-cv-00631**<br>**Judge Aleta A. Trauger** |
| **v.** | ) ) | |
| **WILLIAMSON COUNTY SCHOOL BOARD OF EDUCATION and STACEY EDMONDSON, in her official capacity as District Attorney for the 21st Judicial District of Tennessee,** | ) ) ) ) ) ) | |
| **Defendants.** | ) ) | |

**MEMORANDUM**

The minor plaintiffs allege violations of substantive due process related to their suspensions from middle school. Williamson County School Board of Education has filed a Motion to Dismiss (Doc. No. 24) to which the plaintiff has filed a Response (Doc. No. 35), and Williamson County has filed a Reply (Doc. No. 37.) The motion will be granted in part and denied in part.

**I. FACTS[1]**

The relevant events occurred in Fall 2023 during the minor plaintiffs' eighth grade years at their respective Williamson County, Tennessee middle schools. (Doc. No. 20 ¶ 4.) B.N. had just

---

[1] Unless otherwise stated, the facts are either undisputed or viewed in the light most favorable to the plaintiffs.

turned fourteen. (*Id.* ¶ 37.) It is not alleged how old H.M. was in Fall 2023, but she was thirteen as of the date the lawsuit was filed, May 21, 2024. (*Id.* ¶ 12.)

B.N.

On August 10, 2023, B.N. was having lunch with his friends at Page Middle School. (Doc. No. 20 ¶¶ 25, 37, 39.) A student B.N. did not know ("Student X")[2] joined them and bragged about his summer shooting guns and a grenade launcher with his grandfather. (*Id.* ¶ 39.) B.N. "was curious and began asking this boy what types of guns he was shooting, where he was shooting the guns, and was dubious whether he was telling the truth." (*Id.*) B.N. never threatened anyone or indicated that he would bring a weapon to school. (*Id.* ¶ 40.)

Throughout that afternoon, B.N. relayed this lunchtime conversation to other students. (*Id.* ¶¶ 41–44.) In so doing, he described the boy as "weird," and "jok[ed]" and "commented about" what Student X may do with guns or bombs. (*Id.* ¶¶ 41–43.) As was the case at lunch, B.N. did not make any threats and did not claim that he had a weapon or would bring a weapon to school. (*Id.* ¶¶ 43–44.) "B.N. only stated that he wondered whether the other boy would bring a gun or one of the bombs to school since he seemed weird and he had discussed shooting these types of weapons with his grandfather." (*Id.* ¶ 43.)

That afternoon, a concerned parent reported to school authorities—Assistant Principal Chris Hawkins and Principal Dr. Eric Lifsey—that her son overheard B.N. telling another student that B.N. "had a gun in his backpack and was going to shoot somebody" and that "he was going to get a bomb and blow someone up." (*Id.* ¶ 47.) The principals notified the police. (*Id.* ¶ 46.) That night, after B.N.'s football game, a principal and an officer "confronted" B.N. and told him that

---

[2] Neither party refers to this student by initials, as they do for other minors. This Memorandum will refer to the student who joined B.N. and his friends for lunch as "Student X."

his parents needed to come to school for a meeting. (*Id.* ¶ 54.) B.N. told his father about the encounter on the ride home. (*Id.* ¶ 55.) When they arrived home, they were met by two Williamson County Sheriff's officers—Deputy Winnett and Detective Eaves—who informed Mr. Newcomb about the allegations. (*Id.* ¶¶ 57–59.) After the officers left, Principal Lifsey called Ms.[3] Newcomb, B.N.'s mother, and asked her to bring B.N. in the next morning for a meeting about the allegations. (*Id.* ¶ 61.)

First thing the next morning, on August 11, 2023, B.N. and Mr. and Ms. Newcomb met with the principals. (*Id.* ¶ 63.) B.N. denied the allegation that he had made threats. (*Id.* ¶ 64.) Principal Lifsey told the Newcombs that he would investigate but that the school was "not concerned." (*Id.* ¶ 66–67.) B.N. was permitted to return to class, where he asked two students— R.H.N. and F.O.—if they knew anything about the accusations. (*Id.* ¶¶ 71, 72.) R.H.N. then reported to Principal Lifsey "that B.N. was talking about guns." (*Id.* ¶ 72.) Assistant Principal Hawkins contacted Deputy Winnett and told him "that R.H.N. reported hearing B.N. talking about school threats again." (*Id.* ¶ 73.)

F.O. was called to the office for an interview with school officials and his father. (*Id.* ¶¶ 74–76.) F.O. reported that "he thought B.N. was joking about making a threat to the school." (*Id.* ¶ 76.) F.O. mentioned that another student—B.B.—was present during one of the at-issue conversations. (*Id.*) B.B. was called to the office. (*Id.* ¶ 77.) B.B. reported that B.N. had told F.O. "something about having an AK in his backpack" and that B.N. had said he had a bomb in his backpack and that he would "shoot up the school." (*Id.*).

---

[3] The preference of both Jessica Newcomb and Lesley Mathis to be addressed as "Ms." instead of "Mrs." is evidenced throughout the Amended Complaint.

3

The court construes the Amended Complaint as alleging that, after the interviews on August 11, 2023, Principal Lifsey contacted the police. At Assistant District Attorney Jay Fahey's instruction, Deputy Winnett arrested B.N. and transported him to the Williamson County Juvenile Detention Center. (*Id.* ¶¶ 78–79.)[4]

On August 14, Principal Lifsey informed Ms. Newcomb during a meeting that B.N. would be suspended for 365 days under the school's zero-tolerance policy, as he said a state law governing threats of mass violence mandated. (*Id.* ¶ 109.) During his suspension, Principal Lifsey said, B.N. would attend Williamson County Alternative Learning center ("ALC") and would not be able to play on the football team. (*Id.* ¶ 110.)

On August 16, 2023, the Newcombs received B.N.'s Notice of Suspension by email. (*Id.* ¶ 115.) On August 28, 2023, B.N. appealed his suspension. (*Id.* ¶ 122.) At the disciplinary hearing the next day, B.N.'s one-year suspension was affirmed. (*Id.* ¶¶ 123, 125.) On September 7, the Newcombs and their attorney met with Superintendent James Golden. (*Id.* ¶ 126.) B.N. told his side of the story, including that he had "stated that he thought [Student X] . . . was the type of kid who would have guns in his backpack." (*Id.* ¶ 127.) In a September 15, 2023 email to Mr. and Ms. Newcomb, Superintendent Golden stated that, upon his review, B.N. had "created a rumor of a threat of a weapon at school," which he "intended . . . as a joke" but which "caused a disruption in school." (*Id.* ¶ 128.) Further, Superintendent Golden concluded that B.N. had "served an appropriate amount of time at the ALC and should return to school Monday [September 18]."

---

[4] On a phone call with Ms. Newcomb, Principal Lifsey told her "that B.N. was no longer on school grounds because he [Principal Lifsey,] 'felt that was the right thing to do.'" (Doc. No. 20 ¶ 81.)

4

On September 18, Principal Lifsey told B.N. and Ms. Newcomb that the school "never considered B.N. to be a threat," that "this whole ordeal would never have happened the prior school year," and they could ""blame Governor Bill Lee." (*Id.* ¶ 138.)

H.M.

On August 22, 2023, H.M., an eighth-grade student at Fairview Middle School, was using her school's email service to participate in a written chat conversation with five friends. (*Id.* ¶¶ 142, 146.) By text, the "other girls . . . were teasing H.M. about looking Mexican because of her darker complexion." (*Id.* ¶ 147.) In response to one friend's question about what she[5] had planned for that Thursday, H.M. "responded in jest, 'on Thursday we kill all the Mexicos.'" (*Id.*)

The Amended Complaint does not specify what happened next, but Ms. Mathis, H.M.'s mother, received a call from the Williamson County Juvenile Detention Center, telling her that H.M. was in its custody. (*Id.* ¶ 144.) Ms. Mathis called the school and was told that H.M. had been arrested and transported to the Juvenile Detention Center "for making a 'Threat of Mass Violence.'" (*Id.* ¶ 145.) During a meeting later that day with school officials, the Mathises were told that "the school[']s hands were completely tied and there was nothing they could do, and that they had to immediately arrest H.M. and send her to jail." (*Id.* ¶ 148.) H.M. received a 180-day suspension. (*Id.* ¶ 149.)

The next day, August 23, upon H.M.'s release from custody, the Mathises met with school officials to discuss appealing the suspension. (*Id.* ¶ 149). During the meeting, three Fairview Middle School principals "voiced their support for getting H.M. back in school." (*Id.* ¶ 158.)

---

[5] It is unclear whether this question was addressed to H.M. only or to the group. (*See* Doc. No. 20 ¶ 147 ("One of H.M.'s friends asked in the chat, 'what are you doing this Thursday?' H.M. responded . . . .").)

5

On August 24, the Mathises met with Assistant Principal Lucas Winstead and signed the Notice of Suspension paperwork. (*Id.* ¶ 168.) The paperwork indicated that H.M. was accused of making a Threat Level 1. (*Id.*) H.M. submitted a statement indicating her remorse and that she was only joking around with her friends. (*Id.* ¶ 169.) H.M. appealed the punishment to the Board, which denied the appeal. (*Id.* ¶ 172.) The Mathises appealed to Superintendent Golden, who reduced her suspension to twenty days, during which time she would attend the ALC. (*Id.* ¶ 173.)

The Amended Complaint includes further allegations regarding the minor plaintiffs' custody and conditions of release, but they do not implicate the moving defendant.

## II.     STATUTORY BACKGROUND

In May 2021, Tennessee enacted H.B. 534, which added a new section to the Tennessee Code: Section 39-16-517, "Threat of mass violence on school property or at a school-related activity" ("the act"). Under the act, a "person who recklessly, by any means of communication, threatens to commit an act of mass violence on school property or at a school-related activity commits a Class A misdemeanor." Tenn. Code Ann. § 39-16-517(b). Further, "[a]ny person who has knowledge of a threat of mass violence on school property or at a school-related activity shall report the threat immediately to (A) [t]he local law enforcement agency with jurisdiction over the school property or school-related activity; and (B) [t]he school that is subject to the threat of mass violence." *Id.* § 39-16-517(d)(1). Failure to report such a threat is a Class B misdemeanor. *Id.* § 39-16-517d(3). "'Mass violence' means any act which a reasonable person would conclude could lead to the serious bodily injury, as defined in § 39-11-106, or the death of two (2) or more persons."

6

*Id.* § 39-16-517(a)(1). Other states have enacted similar laws[6] but with widely varying *mens rea* requirements and maximum punishments.[7]

Other parts of the Tennessee Code set out under what conditions schools may and must suspend students. A school principal "is authorized to" suspend a student for "good and sufficient reasons," which include, for example, persistent violations of school rules, "vulgar or profane language," and "malicious damage to property." Tenn. Code Ann. § 49-6-3401(a)(1), (2), (4). Other offenses, by contrast, the Code classifies as "zero tolerance offenses," which "*require*[] the student to be expelled from school for at least one (1) calendar year that can only be modified on a case-by-case basis by the director of schools." *Id.* § 49-6-3401(g)(6)(B) (emphasis added). Until 2023, there were three zero tolerance offenses: bringing a firearm to school, aggravated assault upon a school employee, and drug possession. *Id.* § 49-6-3401(g)(A)–(C).

On March 27, 2023, a shooter killed three students and three staff at the Covenant School in Nashville.

On April 28, 2023 Tenn. Code Ann. § 49-6-3401(g)(2) was amended, effective July 1, 2023, to add a new zero tolerance offense. 2023 Tenn. Pub. Ch. 299 § 1.[8] The new subdivision (g)(2)(D) states "Subject to subdivision (g)(5), threat[s] [of] mass violence on school property or at a school-related activity pursuant to § 39-16-517." Subdivision (g)(5), in turn, states:

---

[6] *See, e.g.*, Ark. Code Ann. § 5-13-302; Mich. Comp. Laws § 750.235b; N.Y. Penal Law § 240.78; Idaho Code § 18-3302I; N.C. Gen. Stat. § 14-277.6; Utah Code Ann. § 76-5-107.1; Vt. Stat. Ann. tit. 13, § 1702; *see also* Fla. Stat. § 836.10 (2023).

[7] Accord (Note) Max Kaufman, *Criminalizing Threats Against Schools: A Divergence of Mens Rea and Punishment Severity in Recent State Legislation*, 91 Fordham L. Rev. 2391, 2429 (2023).

[8] *Accord* Melissa Brown & Kirsten Fiscus, *"They're begging us to do something": Nashville Lawmaker Calls for Gun Reform as Hundreds Protest After Covenant Shooting*, Nashville Tennessean, Mar. 31, 2023 https://www.tennessean.com/story/news/politics/2023/03/30/after-nashville-school-shooting-hundreds-demand-gun-reform-in-nashville/70063649007/ [perma: https://perma.cc/K524-6NGV].

7

If a student threatens mass violence on school property or at a school-related activity pursuant to § 39-16-517, then the director of schools or the head of the public charter school, as applicable, shall require the student to submit to a threat assessment to determine whether the threat of mass violence made by the student was a valid threat. The student may be suspended from attendance at the school and from school-sponsored activities until the threat assessment is complete. If the director of schools or the head of the public charter school determines, based on the results of the threat assessment required in this subdivision (g)(5), that the threat of mass violence made by the student was not a valid threat, then the student shall not be expelled for committing a zero tolerance offense, but may be suspended in accordance with this section.

A publicly available memorandum dated July 24, 2023 from the Tennessee Department of Education's Office of General Counsel reminds school directors of the new law and instructs them to "work with their local attorneys to ensure policies, procedures, and . . . handbooks are revised to include this change in the law prior to the beginning of the 2023-24 school year."[9]

The version of Williamson County School Board Policy 6.309 in effect when the events at issue occurred seemingly incorporated the change to Tenn. Code Ann. § 49-6-3401(g)(2): it included threats of mass violence as a zero tolerance offense, which it defined in the same way as Section 39-16-517, and it mandated a one-year suspension, subject to revision by the superintendent. (Doc. No. 20 ¶¶ 188–89; *accord* Doc. Nos. 25, at 1 2, 35 (describing Policy 6.309 as "related" and "corollary" and to Tenn. Code Ann. § 39-16-517).) In relevant part, the policy stated: "Students shall not . . . threaten to commit an act of mass violence on school property or at a school-related activity." (Doc. No. 20 ¶ 189.)

The Board points out that the law has been amended twice since the incidents took place but asserts that the amendments do not affect its Motion. (Doc. No. 25, at 1 n.1.) No party notes,

_____

[9] Memorandum from Christy Ballard, Tennessee Department of Education Office of General Counsel, to Directors of School (July 24, 2023), available at https://www.tn.gov/content/dam/tn/education/legal/Reminder_New_Zero_Tolerance_Offense.pdf [perma: https://perma.cc/F2A2-99EJ].

however, that, according to what appears to be a live Policy Manual on the Board's website, Policy 6.309 was amended on August 19, 2024. In relevant part, it now says:

> "Students shall not communicate . . . **a valid (credible) threat** to commit an act of mass violence on school property or at a school-related activity as determined by the threat assessment team."[10]

Similarly, in May 2024, the Legislature amended a school violence reporting statute to require that school principals must report *valid* threats of mass violence to the police. 2023 Pub. Acts 882 § 4 (substituting a new subsection (a)(3) in Tenn. Ann. Code § 49-6-4301 ("A director of school . . . who has knowledge of a valid threat of mass violence on school property . . . pursuant to § 39-16-517 made by a student shall immediately report such action to the [police]. . . . A threat of mass violence is valid for purposes of this subdivision (a)(3) if such a determination is made based on the results of the threat assessment required in § 49-6-3401(g)(5).").

## III.    PROCEDURAL HISTORY

Plaintiffs Ralph and Jessica Newcomb, as next friends for B.N., and Todd and Lesley Mathis, as next friends for H.M, filed this action on May 21, 2024. (Doc. No. 1.) The Newcombs are B.N.'s parents; the Mathises are H.M.'s parents. (*Id.* ¶¶ 8, 10.) Initially, the defendants were the Williamson County Board of Education ("Board") and Bill Lee, in his official capacity as Tennessee's Governor. (*Id.* at 1.) The initial Complaint brought two due process claims under 42 U.S.C. § 1983 and a state claim for negligent infliction of emotional distress. (*Id.* ¶¶ 187–216.)

On July 19, 2024, the plaintiffs filed an Amended Complaint (Doc. No. 20), which makes two changes. First, it substitutes Stacey Edmondson, in her official capacity as District Attorney

---

[10] Williamson County Board of Education, 6.309 Zero Tolerance: Drugs, Drug Paraphernalia, Alcohol, Weapons, and Assault (Aug. 19, 2024) (emphasis added), https://onedrive.live.com/view.aspx?resid=C425CC264269ABEF%2174402&authkey=!AFLAD vP_skxjCeM (last visited Nov. 19, 2024) [perma: https://perma.cc/R8QA-DXMU].

9

for the 21st Judicial District of Tennessee, for Governor Lee; second, it adds a plaintiff, Julie Wernert, as next friend for C.W.[11] (*Compare* Doc. No. 1, at 1, *with* Doc. No. 20, at 1.) The plaintiffs allege violations of substantive due process and seek declaratory relief and damages. (Doc. No. 20 ¶¶ 196–217.) Specifically, the plaintiffs seek declarations that the Board's "application of its Policy No. 6.309, as applied to the minor Plaintiffs" and "punitive assignment and transfer [of them] to the Alternative Learning Center" violated the minor plaintiffs' Fourteenth Amendment substantive due process rights. (*Id.* at 43.)

On August 1, 2024, the Board filed its Motion to Dismiss (Doc. No. 24) and accompanying Memorandum (Doc. No. 25).[12] The Board moves for dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (Doc. No. 25, at 1.)

On August 16, 2024, Julie and Scott Wernert, as next friends for C.W., filed a separate action. *See* Compl., *Wernert ex. rel. C.W. v. Williamson Cnty. Bd. of Ed.*, No. 3:24-cv-01000 (M.D. Tenn. Aug. 16, 2024), ECF No. 1. This new action is substantially similar to the above-titled action: it brings the same claims against the same defendants and alleges similar facts. *Wernert* was transferred to this court as a related case. Order, *Wernert*, (M.D. Tenn. Aug. 21, 2024), Doc. No. 7.

On September 6, 2024, the plaintiffs filed a Response to defendant's Motion to Dismiss (Doc. No. 35.) The case caption omits any Wernert. (*Id.* at 1.) And the plaintiffs describe *Wernert* as a "companion related case" (*Id.* at 3), but they do not mention that Julie Wernert was named as

---

[11] While the Amended Complaint includes Julie Wernert in the caption and in the introductory paragraph, it neither lists her among the parties nor alleges any facts about her. (Doc. No. 20, at 1, 3–4.) And the Amended Complaint does not allege any facts about C.W.

[12] Defendant Edmondson's answer is due December 5, 2024. (Doc. No. 43.)

10

a plaintiff in this case. On the same day, the plaintiffs filed a Notice of Dismissal of the pendent state claim. (Doc. No. 36, at 1.) In *Wernert*, upon Joint Stipulation, this court dismissed the identical state claim against the Board. Order, *Wernert*, (M.D. Tenn. Oct. 29, 2024), Doc. No. 28. On September 11, 2024, the Board filed its Reply. (Doc. No. 37.)

Because the Amended Complaint does not allege any facts about C.W., plaintiff Wernert fails to state a claim for relief. Therefore, the court will grant the Board's motion to dismiss all claims as to Wernert.

## IV. LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(1) governs dismissal for lack of subject matter jurisdiction. "Rule 12(b)(1) motions to dismiss . . . generally come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prods., Inc. v. Sherwin–Williams Co.,* 491 F.3d 320, 330 (6th Cir. 2007). A sovereign immunity assertion, as here, constitutes a factual attack. *Dunn v. Spivey,* No. 2:09–0007, 2009 WL 1322600, at *3 (M.D. Tenn. May 11, 2009). When "considering a factual attack upon the court's jurisdiction, no presumption of truth applies to the plaintiff's factual allegations, and the court is free to weigh the evidence and resolve factual disputes so as to satisfy itself as to the existence of its power to hear the case." *Id.* (internal citation and quotation marks omitted). "In its review, the district court has wide discretion to allow affidavits, documents, and even a limited evidentiary hearing to resolve jurisdictional facts." *Gentek*, 491 F.3d at 330. "The entity asserting [sovereign] immunity has the burden to show that it is entitled to immunity, *i.e.,* that it is an arm of the state." *Gragg v. Ky. Cabinet for Workplace Dev.*, 289 F.3d 958, 963 (6th Cir. 2002).

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Such a motion is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted."

11

*Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020) (quoting Fed. R. Civ. P. 12(b)(6)). To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007); *see also* Fed. R. Civ. P. 8(a)(2). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. A complaint that "tenders 'naked assertions' devoid of 'further factual enhancement'" will not suffice. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

In ruling on a motion to dismiss under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

## V.    DISCUSSION

The minor plaintiffs assert claims under 42 U.S.C. § 1983 based on allegations that the defendants violated their right to substantive due process.[13] (Doc. No. 20 ¶¶ 196–217.) To state a § 1983 claim, a plaintiff must allege, as plaintiffs do here, (1) a deprivation of rights secured by the Constitution or federal law and (2) that the defendant deprived him of this right under color of law. *See Jones v. Duncan*, 840 F.2d 359, 361–62 (6th Cir. 1988) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970)).

---

[13] The defendant reads the Amended Complaint as possibly asserting a procedural due process claim. (Doc. No. 25, at 10–16.) The plaintiffs expressly disavow making any procedural due process claims in the Amended Complaint. (Doc. No. 35, at 14 n.2.)

Section 1983 does not permit conventional vicarious liability claims against municipalities for the unconstitutional actions of their employees. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). But "the statute does permit a municipality to be held liable if the plaintiff establishes that the municipality's 'policy' . . . is what led to a violation of the plaintiff's constitutional rights." *Dibrell v. City of Knoxville*, 984 F.3d 1156, 1165 (6th Cir. 2021) (citing *Monell*, 436 U.S. at 694–95). The Board expressly states that school officials acted "in accordance with [Board] policy." (Doc. No. 25, at 10.)

The Fourteenth Amendment to the United States Constitution guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The touchstone of due process is protection of the individual against arbitrary action of government, [including] the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845–46 (1998) (internal quotation marks omitted).

The Due Process Clause provides "heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). The right to attend public school, however, is not a fundamental right or liberty interest. *San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 33–37 (1973). When a government action does not affect fundamental rights or liberty interests and does not involve suspect classifications, it will be upheld if it is rationally related to a legitimate state interest. *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000).

The Fourteenth Amendment protects both procedural and substantive due process, but the plaintiffs allege violations only of the latter. Substantive due process protects certain rights, regardless of the procedures used. *Accord Siefert v. Hamilton Cnty.*, 951 F.3d 753, 765 (6th Cir.

2020). Historically, the Sixth Circuit has allowed substantive due process claims that allege *either* a deprivation of a particular constitutional guarantee *or* actions that "shock the conscience." *See, e.g.*, *Pittman v. Cuyahoga Cnty. Dep't of Child. & Fam. Servs.*, 640 F.3d 716, 728 (6th Cir. 2011) ("Substantive due process claims may be loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that 'shock the conscience.'" (quoting *Valot v. Se. Local Sch. Dist. Bd. of Educ.,* 107 F.3d 1220, 1228 (6th Cir.1997))). "More recently, however," the Sixth Circuit has held that plaintiffs "must show as a predicate the deprivation of a liberty or property interest, *as well as* conscience-shocking conduct." *Siefert*, 951 F.3d at 766 (quoting *Guertin v. State*, 912 F.3d 907, 922 (6th Cir. 2019)) (internal quotation marks omitted) (emphasis added).

Thus, to state a substantive due process claim, the plaintiffs must allege two things. First, they must allege a  deprivation of a constitutionally protected liberty or property interest based on the discretionary conduct of government officials. *American Express Travel Related Servs. v. Kentucky*, 641 F.3d 685, 688–89 (6th Cir. 2011). Second, upon showing a constitutional deprivation, "a plaintiff must show how the government's discretionary conduct that deprived that interest was constitutionally repugnant." *Guertin*, 912 F.3d at 922 (citing *Am. Express*, 641 F.3d at 688). It is difficult to state a substantive due process claim:

> The threshold for the invocation of substantive due process is incredibly high, as it is intended as a final safeguard against government actions that scream abuse and shock the conscience. To that effect, the protections of substantive due process are limited to government action that is 'arbitrarily and oppressively exercised,' where 'only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'

*Flege v. Williamstown Indep. Schs.*, No. 06-47-DLB, 2007 WL 679022, at *15 (E.D. Ky. Mar. 1, 2007) (quoting *Lewis*, 523 U.S. at 846).

"State law determines what constitutes 'property' for due process purposes." *Seal*, 229 F.3d at 574. The Tennessee Constitution guarantees to Tennessee's students "the right to a free public education." *Leeper v. State,* 53 S.W. 962, 965 (Tenn. 1899) (citing Tenn. Const. art. XI, § 12). As a result, Tennessee public school students enjoy a property interest in middle school education. *Seal*, 229 F.3d at 574. Accordingly, students cannot be deprived of their interest in public education without due process of law. *See Goss v. Lopez*, 419 U.S. 565, 577 (1975).

In cases involving school discipline, "a substantive due process claim will succeed only in the rare case when there is no rational relationship between the punishment and the offense." *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000) (quoting *Rosa R. v Connelly*, 889 F.2d 435, 439 (2d Cir. 1989) (internal quotation marks omitted). "As a matter of federal constitutional law, however, the Board may not expel students from school arbitrarily or irrationally." *Id.* at 589 (denying summary judgment for Knox County Board of Education because, when it is "not clear that [a] Board's decision was rational, . . . school boards with . . . 'Zero Tolerance' policies should not be entitled to summary judgment in civil rights actions arising from their decisions to impose long-term suspensions and expulsions").

As the Sixth Circuit wrote in *Siefert*, "[w]hat counts as 'conscience shocking' is not always so clear." *Siefert*, 951 F.3d at 766. And whether conduct is conscience shocking is context-specific. *Accord Lewis*, 523 U.S. at 850 ("Deliberate indifference that shocks in one environment may not be so patently egregious in another[.]"). Moreover, behavior falls on a spectrum—from negligence, on one end, to intentional harm on the other. "[I]n the middle, there is something more than negligence but less than intentional conduct, such as recklessness or gross negligence, which presents more difficult cases." *Siefert*, 951 F.3d at 766 (quoting *Guertin*, 912 F.3d at 923) (internal quotation marks omitted). As alleged, this case is in the middle.

15

**Count 1**

The first claim, which does not specify defendants, is titled "Violation of Fourteenth Amendment Due Process–As Applied." (Doc. No. 20 at 39.) The court construes this claim as alleging that the Board violated the minor plaintiffs' substantive due process rights by notifying police about their actions and then suspending them, which caused injury to their property interest in attending school and caused further indignities.

    A.  <u>Notifying Police</u>

          1.      12(b)(1)

The Board asserts a sovereign immunity defense under Rule 12(b)(1) as to the plaintiffs' claim that the schools' reporting their concerns to law enforcement violated their due process rights. (Doc. No. 25, at 8–10.) The Board argues that, while sovereign immunity does not always extend to school boards, "[w]hen a local body or its official are sued for complying with state mandates that afford no discretion, they act as an arm of the state, and enjoy the state's immunity." *L.E. ex rel. Squivel v. Lee*, No. 3:21-CV-00835, 2024 WL 1349031, at *13 (M.D. Tenn. Mar. 29, 2024) (Crenshaw, C.J.). The Board concludes that, because school administrators have a non-discretionary duty under the statute to report threats to the police, it was acting as an arm of the state. (Doc. No. 25, at 9–10.)

But, as the Board notes, the law requires "*any person* who has knowledge of a threat of mass violence" to report it to the police. (Doc. No. 25, at 9 (quoting Tenn. Code Ann. § 39-16-517(d)(1)) (emphasis added).) By this logic, *anyone* who complies with the law is a state actor. Merely complying with the law does not make someone, including a school administrator, a state actor. Thus, the school and its employees were not acting as an arm of the state by notifying the

police. The Board is not immune from suit on sovereign immunity grounds, so its 12(b)(1) argument fails.

### 2. 12(b)(6)

School administrators received reports of what they thought were threats and reported them to the police, as they believed state law required. The plaintiffs argue that, even in the schools' overreaction to the minor plaintiffs' speech, the schools only ever claimed that the students made "Level 1" threats and that "the school board's policy does not call for a referral to law enforcement." (Doc. No. 35, at 4.) The plaintiffs argue that the schools' failure to follow this policy was "*per se* arbitrary" and therefore a substantive due process violation. (Doc. No. 35, at 14, 17.)

The defendants respond that state law mandated that they report the threats and that "it is better to err on the side of caution as a delay in reporting could result in an entirely preventable tragedy." (Doc. No. 25, at 19–22; *see also* Doc. No. 27, at 3–4.)

The plaintiffs do not identify any case that supports their theory that a school's deviation from its policy on when to call the police violates students' substantive due process rights, and the court's research yields no such cases.

However, in *S.S. v. E. Kentucky Univ.*, the court dismissed the plaintiff's substantive due process claims brought under the state-created danger theory. 431 F. Supp. 2d 718, 732–33 (E.D. Ky. 2006), *aff'd*, 532 F.3d 445 (6th Cir. 2008). Under this theory, a plaintiff must show "an affirmative act that creates or increases the risk [to the plaintiff], a special danger to the victim as distinguished from the public at large, and the requisite degree of state culpability." *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 464 (6th Cir. 2006) (citing *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1065–66 (6th Cir. 1998)). First, the court held that the school's decision to call the police was not an affirmative act that increased the risk to the plaintiff student. As the court noted,

17

"attempts by state officials to improve safety do not become actionable affirmative acts merely because harm ends up befalling an affected person." *Id.* (citing *Cartwright v. Marine City*, 336 F.3d 487, 493–94 (6th Cir. 2003)). The court held that, even if the school's decision to call the police *had* satisfied the first prong, no reasonable juror could find that school officials had acted with the requisite culpability. *Id.* at 733. To state a claim under the state-created danger theory, a plaintiff must show that the "state must have known or clearly should have known that its actions specifically endangered an individual." *Id.* (citing *McQueen*, 433 F.3d at 469).

By analogy, the court is persuaded that the Board did not violate the minor plaintiffs' substantive due process rights by calling the police. Just as school authorities in *S.S. v. E. Kentucky Univ.* did not take an affirmative action that increased the risk to the plaintiff students, in this case the schools' decisions to contact the authorities merely alerted them to a perceived threat. Here, too, any argument that school officials are sufficiently culpable would fail.

Accepting the plaintiffs' factual allegations as true and drawing all reasonable inferences in favor of the plaintiffs, the court finds that the plaintiffs do not make out a substantive due process claim related to the schools' decisions to call the police. Even if neither state law nor district policy mandated that school officials call the police, it is not clear under what theory—absent an equal protection or similar argument—calling the police in response to a threat or perceived threat of violence would constitute conscience-shocking behavior that deprived the students of a constitutionally protected interest.

B. Suspending the students

Construing the Amended Complaint in the light most favorable to the plaintiffs, accepting all well-pleaded allegations as true, and drawing all reasonable inferences in favor of the plaintiffs, the court finds that the minor plaintiffs have stated a claim that the Board violated their substantive

due process rights by suspending them. And even though Superintendent Golden drastically reduced their initial punishments, the minor plaintiffs have nevertheless stated claims that the schools acted arbitrarily, in a constitutional sense.

      *i.   B.N.*

      The Amended Complaint alleges that B.N. did not make a threat—joking or otherwise. B.N. asked Student X about what guns *he* shot (Doc. No. 20 ¶ 39); he joked and speculated about whether *Student X* might bring a weapon to school (*Id.* ¶¶ 41, 43-44); and, after he found out that other students had told school officials about B.N.'s comments, B.N. confronted them about it. (*Id.* ¶ 71.)

      In seeking dismissal of B.N.'s claim related to his suspension, the Board takes seemingly conflicting positions. For example, the Board's position on what B.N. did is equivocal: in the same paragraph, the Board describes B.N.'s conduct alternately as *creating a rumor of* a threat and *making* a threat. (Doc. No. 25, at 18.) But these are two different things. Similarly, the Board writes that, on August 11, Principal Lifsey "received *another* report that B.N. was talking about firearms." (*Id.* at 2 (emphasis added); *see also id.* at 11 ("[A]dministrators received a . . . report that B.N. was discussing weapons at school.").) After receiving that report, "[i]n response, Assistant Principal Hawkins notified law enforcement, and [the school] began investigating the new allegations." (*Id.* at 4.) But *discussing* firearms is not a threat. In a similar vein, the Board writes: "[a]lthough Plaintiffs claim that this speech was made in jest, the fact remains that *threats were discussed*." (*Id.* at 24; *see also id.*, at 19 ("[I]t is no longer permissible to discuss threats in a school environment.").) The court infers from this claim that it is the defendant's position that *discussing threats* is a violation of school policy. But this is implausible—or else, surely unconstitutional.

Further confusing matters, in addition to describing both minor plaintiffs as making "threats," the Board repeatedly uses the phrase "threat-related speech" to describe what they said. (*See, e.g.*, *id.* at 1–2, 7–15, 19, 20, 22, 24; Doc No. 37, at 2, 2 n.2.) But neither Board policy nor the state law at issue uses this phrase. And any such policy or law would likely be unconstitutionally overbroad or vague. By way of example, were students to read and discuss this Memorandum, that would constitute discussing threats or "threat-related speech."

Regardless, the facts as alleged by B.N. plausibly establish that his ultimate punishment was arbitrary in a constitutional sense. B.N. was initially suspended for 365 days for making a threat of mass violence, as purportedly mandated by Board policy and state law. (Doc. No. 20 ¶ 109.) His first appeal was denied. (*Id.* ¶ 125.) On Thursday, September 7, the Newcombs and their attorney met with Superintendent Golden. (Doc. No. 20 ¶ 126.) Because Superintendent Golden would be out of town the next week, and because he wanted to review the audio from the disciplinary hearing, he did not provide the Newcombs a timeline on a decision. On Friday, September 15, Superintendent Golden emailed the Newcombs and told them that he had concluded that B.N. had "created a rumor of a threat of a weapon at school" and that it was "intended . . . as a joke, but that joke caused a disruption in school." (Doc. No. 28 ¶ 128.) Superintendent Golden "determined that he has served an appropriate amount of time at the ALC and should return to school Monday." (*Id.*) In total, B.N. was suspended for just over one month.

Drawing all reasonable inferences in B.N.'s favor, the timing of superintendent Golden's decision regarding B.N.'s offense and the corresponding length of B.N.'s punishment could be evidence of an arbitrary punishment. It would be a remarkable coincidence that the appropriate punishment for B.N. concluded at the end of the day on which the superintendent decided what the appropriate punishment ought to be. Even the wording of Superintendent Golden's email

20

suggests as much: "[B.N] has served an appropriate amount of time at the ALC and should return to school Monday." (Doc. No. 28 ¶ 128.) One might plausibly infer that, had Superintendent Golden *not* been out of town the week of September 10, he would have reached the same conclusion earlier, and B.N.'s suspension would have ended sooner.

B.N. has stated a plausible claim that the Board violated his substantive due process right by suspending him, so the Board's motion to dismiss this claim as to B.N. will be denied.

ii. *H.M.*

H.M.'s case is no more straightforward. As alleged, H.M. said "on Thursday we kill all the Mexicos." (Doc. No. 20, ¶ 147.) The provided context does not quite clarify this statement's meaning, other than that H.M. said it "in jest," in response to a friend who asked, "what are you doing this Thursday?" during a conversation in which "the other girls on the chat were teasing H.M. about looking Mexican because of her darker complexion." (*Id.*) H.M. submitted a "contrite statement" expressing "sincere remorse and regret for her words that had been taken wholly out of context, and that she was only joking around with her friends." (Doc. No. 20 ¶ 169.)

The Board argues that she made a threat, and "[t]hough she may have made this comment in jest, the fact remains that she made a threat based on ethnicity over school email groupchat." (Doc. No. 25, at 18.) The Board turns to the act's text for support.

Under the act, a "person who recklessly, by any means of communication, threatens to commit an act of mass violence on school property or at a school-related activity commits a Class A misdemeanor." Tenn. Code Ann. § 39-16-517(b). "'Mass violence' means any act which a reasonable person would conclude could lead to the serious bodily injury, as defined in § 39-11-106, or the death of two (2) or more persons." *Id.* § 39-16-517(a)(1).

The parties have argued over the meaning of "reasonable person" in the statute. The plaintiffs argue that neither plaintiff made "threats which a reasonable person would conclude could lead to . . . serious bodily injury." (Doc. No. 35, at 7; *see also id.*, at 6; Doc. No. 20 ¶ 202.) The Board counters that the plaintiffs misconstrue the statute. The Board contends that "reasonable person" governs only "mass violence." (Doc. No. 25, at 19–20.) That is, whether a reasonable person would think the *threat* would lead to mass violence is irrelevant. Instead, "Section 39-16-517 proscribes *any* recklessly made threat to commit an **act** that a reasonable person would conclude could seriously injure or kill two or more persons." (*Id.* at 20 (second emphasis added).) For example, the defendant writes, the law "prohibits individuals from recklessly threatening to 'shoot up the school' regardless of whether the threatener is serious because a reasonable person would conclude that 'shooting up the school' could result in serious injury or death to two or more persons." (*Id.* at 20–21 (citing Tenn. Code Ann. § 39-16-517).)

As applied to H.M., the Board writes: "[A] reasonable person would conclude that H.M.'s threat to 'kill all the Mexicos' could result in serious injury or death to two or more persons." (Doc. No. 25, at 21 (citing Tenn. Code Ann. § 39-16-517). "Accordingly, FMS administrators were legally required to notify law enforcement." (*Id.* at 22 (citing Tenn. Code Ann. § 39-16-517).) Defendants have the better reading of the statute. But this does not win them the argument.

First, it is far from clear that H.M. threatened "to commit an act of mass violence on school property or at a school-related activity." Accepting the Board's position that a reasonable person would conclude that killing all Mexicans would entail serious injury or death to more than two persons, the Board does not discuss what this has to do with violence *at school* or *at a school-related activity*. Even if H.M.'s school had Mexican students enrolled, there was no indication in H.M.'s statement where the threatened violence would take place.

22

Second, while the Board advances the more compelling interpretation of the statute, the word "could" in the sentence "'Mass violence' means any act which a reasonable person would conclude *could* lead to the serious bodily injury . . . or the death of two or more persons." is doing a lot of work. Tenn. Code Ann. § 39-16-517(a)(1) (emphasis added). By way of illustration, there are at least two ways the Board's analysis leads to absurdity. To start, it is not clear what the Board's position is regarding context, satire, or euphemism. For example, imagine that at a homecoming rally the football captain says "We're going to crush the Nashville Wildcats!" Under the Board's analysis, while the football captain may have been using "crush" euphemistically, and while this is not a serious threat, and "while the credibility of the threat may be called into question, it cannot be seriously disputed that [crushing an entire football team is an act that] a reasonable person would conclude could lead to serious bodily injury or death." (Doc. No. 37, at 3.) Moreover, the implausibility of an action—here, a middle school student killing all Mexicans—ought to affect the threat analysis. What if, for example, H.M. had threatened to cast a magical killing spell on a large group of people? What if H.M. had threatened to fly to the moon and shoot at people using a space laser? The court agrees that killing every Mexican would involve death to at least two people, but any serious argument on this topic needs to consider the threatened action's plausibility.

Third, even if H.M. did make a threat, the Board does not explain how it is that H.M.'s threat was *recklessly* made. *See* (Doc. No. 25, at 18 ("Though she may have made this comment in jest, the fact remains that she made a threat. . . .").) Discussing the recklessness standard for punishing threats, even in the civil context, the Supreme Court wrote: "it means that a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *Counterman v. Colorado*, 600 U.S. 66, 76, 79 (2023) (citing *Elonis v. United States*,

575 U.S. 723, 746 (2015) (Alito, J., concurring in part and dissenting in part)); *accord Wisniewski v. Bd. of Educ.*, 494 F.3d 34, 38 (2d Cir. 2007) (quoting *Counterman*, 600 U.S. at 69 ("The [*Counterman*] Court . . . held that under a true threats analysis, the First Amendment 'requires proof that the defendant had some subjective understanding of the threatening nature of his statements.'")). The Board has not explained how H.M.'s comment was reckless under this standard.

H.M. has stated a plausible claim that the Board violated her substantive due process right by suspending her, so the Board's motion to dismiss this claim as to H.M. will be denied.

**Count 2**

The second claim, which names only the Board as the defendant, is titled "Denial of Substantive Due Process." (Doc. No. 20, at 40.) The court construes the claim as alleging that the Board violated the minor plaintiffs' substantive due process rights by depriving them of their property interest in education by sending them to the Alternative Learning Center. The plaintiffs bring an as-applied challenge (*see* Doc. No. 20 ¶ 6), but none of the allegations regarding the minor plaintiffs' time at the Alternative Learning Center—aside from the decision to send them there— is specific to them. For example, the allegations concern the overall "chaotic and disruptive" classroom experience and lack of printed handouts. (Doc. No. 20 ¶¶ 212–15.) But even if the plaintiffs had brought a facial challenge to the conditions at the Alternative Learning Center, the conditions as alleged do not, even at this stage of litigation, rise to "conscience-shocking" behavior required to state a substantive due process claim. *See* discussion *infra*, at pp. 13–15.

The plaintiffs have failed to state a claim that the conditions at the Alternative Learning Center violated their substantive due process rights, so the court will grant the Board's motion to dismiss this claim.

## VI.    CONCLUSION

For the reasons set forth herein, the Motion to Dismiss will be denied as to Count 1 in part—as related to the minor plaintiffs' suspensions—and otherwise granted. Because the Amended Complaint does not allege any facts about C.W., the plaintiff Julie Wernert fails to state a claim for relief. Therefore, the court will grant the Board's motion to dismiss all claims as to Julie Wernert.

ALETA A. TRAUGER
United States District Judge